FILED ✓    LODGED ___
RECEIVED ___    COPY ___

JUN 1 0 2019

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Dimitri Rozenman

253132

ASPC Tucson

Unit Santa Rita

P.O. Box 24401

Tucson, AZ 85734


United States District Court

District of Arizona

| | |
|---|---|
| Dimitri Rozenman, | No. CV-18-01789-PHX-GMS(JZB) |
|      Petitioner, | First Amended Reply to Limited Answer |
| v | to Petition for Writ of Habeas Corpus |
| Charles L. Ryan, et al., | and |
|      Respondents | Notice Re: Exhibits |
| | Evidentiary Hearing Requested |


## Notice Re: Exhibits.

This Reply is filed in conformity with this Court's 5/20/19 Order (Doc 50). All the referred exhibits (including Phx Police Operations Order 8.1), without exception, are precisely identified by Letters designated by Respondents. On 10/05/18 Respondents filed limited Answer with attached exhibits A through QQQ and are referred as such in this Reply. On 1/14/19 Respondents filed Motion to Supplement (Doc 33) with attached exhibits A through G. Those exhibits are referred as Ex A of Doc 33, or Ex B of Doc 33, etc.


## Table of Contents.

1. Rebuttal to Factual and Procedural Background      2

2. Rebuttal to Assertion That Ground 5 is Non-Cognizable.    22

3. Rebuttal to Assertion That Grounds 3, 4 and 5 are Procedurally Defaulted.    26

4. Rebuttal to Assertion That the State Court's Rejection of Petitioner's Claim    31
That the State Failed to Preserve Evidence Was Neither Contrary to, Nor an Unreasonable Application of Federal Law, Nor an Unreasonable Determination of the Facts.

5. Rebuttal to Assertion That the State Court's Rejection of Petitioner's Brady    63
Claim Was Neither Contrary to, Nor an Unreasonable Application of Federal Law, Nor an Unreasonable Determination of the Facts.

6. Rebuttal to Assertion That the State Court's Rejection of Petitioner's Prose-    77
cutorial Misconduct Claim Was Neither Contrary to, Nor an Unreasonable Application of Federal Law, Nor an Unreasonable Determination of the Facts.

7. Conclusion.    82

8. Certificate.    88

## Rebuttal to Respondents' Factual and Procedural Background.

Respondents present numerous assertions of Petitioner's guilt that were supposedly established at trial. The presence of such facts, if true, would naturally provide evidence of guilt beyond the evidence established through not impounded recordings. So, the logic goes, that even if recordings are deemed not trustworthy, the presence of such facts, if true, would not undermine confidence in the verdict. Conversely, if the recordings are deemed not trustworthy, the absence of any other evidence of guilt would, quite naturally, undermine confidence in the verdict. Nearly for every one of these so called "facts," presented by Respondents, there was a fact to the contrary adduced at trial. Petitioner rebut the factual assertions presented by Respondents not to establish that jury's verdict contradicts the trial evidence, but solely to establish that, once recordings are deemed unreliable, there isn't a single piece of evidence that a fair-minded juror can attribute to Petitioner's guilt.

The attorney for the Respondents asserts that trial evidence established that Petitioner offered to pay Levi Najar (L.N.) $70,000 in installments to have the ex-wife killed (Limited Answer, p3)

However at trial (R.T 03/18/13 at 5-6) LN provided evidence that previously, when interviewed by defense attorney, while under oath, he asserted that he was supposed to get paid $80,000 or $90,000.

Q On page 78, if you can see Line 14, you are asked, "Well, how much were you supposed to be paid in total, 5,000?" And the answer that you provide on Line 16, "No, it was like a lot. It was Like, say like 80 or 90 grand, something like that." That was your answer, correct?

A That's what it says.

The following day (R.T 03/19/13 at 72, 76-77) LN testified that in a different interview he asserted that he allegedly was supposed to get paid $50,000.

Q By Mr Rozenman: Next question: "I am then going to work out a plan to kill them, right?"

Your answer, "Yes, sir. I'm going to get paid in full the total amount, $50,000, right?"

"Yes, sir."

Next question: "And then after I have been paid the entire 50,000, then I'm going to kill them, right?"

"Yes, sir."

Mr Najar, this is different than what you told us earlier, isn't it?
A No. Because that was — the first one was right and the second way I said it was wrong. I probably —
Q You answered my question.

\*       \*       \*

Q By Mr Rozenman: And do you see the dollar amount there is different than $70,000?

A   Yeah, it says so.

The attorney for the Respondents asserts that the alleged plan was first to have the ex-wife sign a paper relinquishing all the money awarded in the divorce decree and then kill her and her family. (Limited Answer, p 3.)

At trial, however, evidence was provided that L.N. previously, while under oath (R.T. 03/18/13, at 5), provided testimony (Id at 12) that the alleged plan was to simply kill the ex-wife and her family for $5,000:

Q   On Line 1 it reads, and then five days later, approximately — — "Five days later, approximately two days before you met with Jana, he [Petitioner] gives you $5,000, right?" Your answer, "Right."

The question, "What was the money for, what were you supposed to do in exchange for $5,000?" Your answer, "Have them killed." Question, "That's it? At that point in time that's all that was supposed to happen, just have them killed; is that right?" Your answer, "I think so."

The Respondents assert that Petitioner gave L.N. $5,000 in cash. (Limited Answer, p 3.)

At trial, however, not only there was no tangible evidence presented that Petitioner gave L.N. $5,000 in cash, but there was evidence presented that contradicts L.N.'s statement that the alleged $5,000 was spent on clothes and school supplies. (R.T. 03/13/13 at 87):

Q   Do you remember at that time you told us — — your answer at that time was — — let me read it for the record.

A   You can read, but it's not from the same thing I'm reading from.

Q   I'm on page 55. What page are you — —

A   I'm too.

Q   Do you see Line 22?

4

A  Yes, it is

Q  Line 22 reads: Like I say, I don't know, I think it was like clothes or school supplies or something at that time.

Do you see that?

A  Yup

L.N's wife, Metika Najar, testified, however, that she has never seen any clothes or school supplies (R.T. 04/22/13 at 87, 83):

Q  Do you have any knowledge of any large money that your husband -- well, by "Large" I mean like say like several thousand dollars that your husband might have got, might have received from anybody during the time of 2008, 2009?

A  No.

*          *          *

Q  You said you didn't see any $5,000 or anything close to that number. Did you observe any kind of purchases that were unusual or large that could be around that dollar amount? Did you observe anything like that?

A  No.

The attorney for the Respondents asserts that "Defendant gave L.N. $500 in cash to get the hit men out of town. Defendant indicated by nodding that all he wanted L.N.'s men to do was kill the ex-wife and her family." (Limited Answer, p3)

Considering that this was a murder for hire investigation and L.N. was told to record the Petitioner to agree to have his ex-wife and her family murdered and considering how easy it would by for L.N. to ask: Do you want your ex-wife and her family murdered? And point an

5

audio/video key fob towards Petitioner and record his response and reaction, one has to really wonder how come the surveillance, even now, not having been preserved, still does not show the Petitioner nodding or agreeing to have the ex-wife and her family murdered?

On the HAWK recording (EX 96, at 21 min, 4 sec) L.N. says:

The hell I need that. Do you have any possible way to get anything, any type of um, like five hundred or a grand? I'm just saying that I'm definitely need that to make my trip. That's my personal.

Thus it is beyond dispute that trial evidence established that L.N. asked for $500 to make his trip to Kentucky. It is also beyond dispute that no portion of the non-impounded recordings shows Petitioner nodding or agreeing to proposition to have the ex-wife and her family killed.

The surveillance (EX 96 HAWK at around 24 min, 40 sec) does however reveal L.N. telling Petitioner, probably with the intent to provoke Petitioner and hopefully elicit incriminating statements, that the ex-wife offered money to have Petitioner disposed:

She's all like, I, I know where to get more money out of him. If you want me to, just go take care of him and I'll make sure you get your money.

Not only no portion of the surveillance shows Petitioner nodding in agreement or agreeing to have L.N.'s men murder the ex-wife and her family, but at trial (R.T. 03/18/13 at 117-132) L.N. himself spent considerable amount of time testifying and ascertaining precisely to what the Petitioner nodded in agreement and shook his head in disagreement. Petitioner is in possession of a transcript of a HAWK recording that has a time column indicating precisely when each segment of the HAWK recording of surveillance began. On the HAWK recording the section that corresponds to the relevant section of EX 97, audio/video recording, is 27 minutes into sur-

veillance. Petitioner, however, does not have an equivalent transcript of the audio/video recording with a time column and therefore can only indicate that the portion of transcript (R.T. 03/18/13 at 117-124) that corresponds to the audio/video recording is about 27 min into ex 96, HAWK.

Since the attorney for the Respondents asserts that Petitioner nodded to have the ex-wife and her family murdered Petitioner cites precisely what L.N.'s trial testimony established Petitioner nodded and shook his head to. The following testimony begins from the very beginning of what is now the only visible video portion of ex 97, audio/video recording. R.T. 03/18/13 at 117:

Q  By Mr Rozenman: Mr Najar, can you tell us what is my reaction to the words do you want me to do it, do you want me to sit there and do these dirty deeds. What am I doing?

A  You shook your head.

Although L.N. following this answer became cantankerous, it is clear that Petitioner disagreed to have anything that can be construed as "dirty deeds" to be done to the ex-wife and her family. R.T. 03/18/13 at 120:

Q  So we have not to leave this, to leave them two dudes alone; is that correct?

A  Yeah, that's what you nodded to.

*          *          *

Q  Okay. What am I doing, Mr Najar?

A  You shook your head no.

Q  Okay. And let's just read for the record what am I shaking my head no. I'm going to stick to my initial contract. I'm going to go

after her, do all that and then I will deal with this later. You don't understand these people have to die. And in order for me to do that I have to know that you want me to do that. And I'm shaking my head no; is that correct?

Thus the recording of surveillance, despite not having been preserved, clearly establishes that Petitioner did not want anybody to go after his ex-wife and did not want anybody to die.

R.T. 03/18/13 at 121-122; Respondents' Ex V:

Q I'm reading how you just gonna stop with her and them if these guys can turn you in and I'm shaking my head no; is that correct?

A That's right. That's what you did

\*        \*        \*

Q Mr Najar, what am I shaking my head to?

A That you're going to go ahead and handle the hit men situation on your own time.

Q That's what I -- that's correct. Let's read it for the jury... I'm beyond relaxed, man. But I have got two loose ends I gotta tie up and in order to kill these guys, I need your okay. Only reason being is because it's your thing. If you don't want me to take care of them like I'm going to Jana and them, I don't give a fuck, you can deal with that later on your own terms, I'm sorry. You can deal with that later on your own terms. Is that correct?

Mr Eaves [prosecutor]: That's not the end of the sentence.

Q By Mr Rozenman: No. We understand it's not the end of the sentence. There is a nod after the word on your own terms;

8

is that correct, Mr Najar? If not, we can review it so we can get --
you can tell us with better certainty if you need us to rerun it
again. Am I nodding after the words "you can deal with that later on
your own terms?" (The quotation marks are added by Petitioner.)

A   I believe you nodded twice, after "your own terms" and "that's
how you want to deal with it." I don't know. (The quotation marks are
added by Petitioner.)

Q   You're right. We're getting one thing at a time. Let's try to do one
thing at a time. So we can preview it. It's not a big deal. We can pre-
view it. It's only 20 seconds or five seconds probably. I'm nodding to
and I just want to make sure that we have a clear record. "You can
deal with that later on your own terms." I'm nodding, correct?
    (The quotation marks are added by Petitioner.)

A   To make it clear and to reference it so that we're all clear on
everything that's being said here is that actually you don't want me
to go ahead and deal with _anything_... (Emphasis mine.)

Id at 124:

Q   Okay. So correct me if I'm wrong, we have "you can deal with that
later on your own terms," there is a nod and there is a nod following
your words which read afterwards. "You can deal with that later on
your own terms," there is a nod. "That's how you want to deal with it,"
there's a nod again; is that correct? (The quotation marks are added by
Petitioner.)

A   Yeah.

Thus L.N.'s testimony above clearly disproves Respondents' assertion (Limited Answer
p3) that Petitioner nodded in agreement to have the ex-wife & her family killed.

Granted, immidiately following the surveillance (R.T. 03/18/13 at 125-26, Respondents' Ex V) L.N. brazenly misled detectives to believe that he supposedly video recorded Petitioner nodding to have the ex-wife and her family killed. That statement by L.N. does not establish what the Petitioner nodded to, especially since it is contradicted by trial evidence. Only the audio/video recording of surveillance (trial ex97) and L.N.'s trial testimony in reference to this recording provide credible evidence, for purpose of establising, what Petitioner specifically nodded in agreement or shook his head in disagreement to. This evidence, together with L.N.'s trial admition (R.T. 03/12/13 at 120-121, Respondents' Ex S), that 2 days following the surveillance he apprized detectives Warner and Ayala, that Petitioner did not understand what L.N. had Petitioner to agree to, provide an undisputable fact that on recordings of surveillance Petitioner did not agree to have anybody murdered. Rather Petitioner's nods were misrepresented by L.N. to the detectives, immidiately following the surveillance, as nods to have the ex-wife murdered only to suit L.N.'s purpose.

Next, the attorney for the Respondents asserts that "Defendant never told L.N. "you're scaring me," threatened to call police or called him crazy. (Limited Answer, p.3.)

Since all of the recordings of surveillance have not been impounded for over four months, and since detectives Warner and Egea lied why they did not impound critical evidence, there is no way to ascertain whether or not these or similar statements were made by Petitioner on the surveillance. An observation can be made, however, that numerous of Petitioner's responses are now inaudible and the video portion of the audio/video recording (trial ex 97) is now pitch black for all of the surveillance, other than a small segment discussed above.

The attorney for the Respondents asserts that "[i]n a recorded

confrontation call six days later, L.N. told Defendant that his ex-wife and her parents were dead, to which Defendant immediately asked L.N. when he was going to return to work" (Limited Answer, p 3)

Once again, since the recording of the confrontation call, EX 80, was also not impounded for over four months (R.T. 04/04/13 at 29-30), (see also EX 2 of Petition for Post-Conviction Relief where this recording is identified as item #5 on Impound Property Invoice and is described as confrontation call from K[Y]) it cannot be known if, in fact, Petitioner asked L.N. when he was going to return to work, or if Petitioner asked this question in the context presented by prosecution and if Petitioner asked this question immediately upon receiving the call.

The attorney for the Respondents asserts that "[d]efendant did not call 9-1-1 that night to report that he had just been told his ex-wife and her family had been murdered.

When police called on Defendant at his girlfriend's apartment early the next morning and told him about the "murders," and repeatedly asked him if he knew who might have done this, Defendant never mentioned L.N." (Limited Answer, p 3).

While evidence of such passivity can give rise to inference of guilt, at trial such inference was rebutted through testimony of Det Rafael Egea (R.T. 03/25/13) and through testimony of Sergeant Thomas Britt (R.T. 04/18/13).

R.T. 03/25/13 at 105-106:

Q What is your experience with interrogation of immigrants from the former Soviet Union[1]?

A Little to none.

Footnote 1: Petitioner is an immigrant from Ukraine.

11

Q  Do you know if there is a general tendency among immigrants from the former Soviet Union to be distrustful towards police. Do you know the reason?

&ast;        &ast;        &ast;

The Witness: I am not.

Q  By Mr. Rozenman: Now, you told us that -- you told us that you came to do this death notification, or what you call death notification, and that you learned that prior to this death notification there were calls from Levi Najar from Kentucky; is that correct?

A  That's correct.

Q  Did you know, or did you have any knowledge to believe whether I believed any information that Levi Najar provided to me over the phone?

&ast;        &ast;        &ast;

A  I have -- I can't answer that question. I have no idea what you believed at that moment.

Q  So you didn't know if I didn't believe any of it or if I believed all of it, correct?

R.T. 03/25/13 at 124:

Q  When I said, "Let's go to the crime scene."

A  Correct.

Q  Was that any indication that I didn't believe what you told me?

A  I didn't have an impression on that statement.

R.T. Id at 126:

Q  If you can move page 9 line 4. I say, "I don't fucking believe

12

this," and the next sentence I say, "I don't fucking believe what you are saying."

A  Correct.

On 04/18/13 Petitioner presented testimony of Sgt Thomas Britt.

R.T 04/18/13 at 50:

Q  Can you please tell the Jury what you do and what is your rank?

A  I'm a Sergeant.

Q  And how long did you work in -- as a police -- as a detective?

A  Uh, as a Detective I worked -- about eight years, nine years.

R.T. Id at 51:

Q  And I understand that you speak Russian, correct?

A  Yes.

Q  And can you tell us, at some point you worked in the former Soviet Union, is that right?

A  Yes.

R.T. Id at 67-68:

Q  Based on the experience that you have working in the former Soviet Union, can you tell us if people from the former Soviet Union are trustful or distrustful towards the Police?

Ms. Burgess [prosecutor]: Relevance, foundation.

The Court: Overruled, I'm going to allow it. Go ahead.

The Witness: In a big way they're distrustful of the police, but over the past 20 years or so, especially here in the United States -- and that's what I will address, Here in the United States that's changed tremendously because they've lived here now,

13

generally speaking long enough to know that the police and law enforcement here in the United States don't operate in the same fashion that they were use to in the Soviet Union. So, that trust has changed tremendously. Of course, there's always some who don't.

On cross-examination the prosecution tried to limit the effect of Sgt Britt's testimony. R.T. 04/18/13 at 75-76:

Q   And then you were asked some questions about trust and distrust of the police. And you basically said that like anybody else, different people have various levels of trust?

Mr Rozenman: Objection. Misstates the evidence.

The Court: Sustained. Would you re-characterize, please.

By Ms Burgess:

Q   Detective -- I'm sorry, Sergeant, in your experience people who have lived in the United States for over two decades, who have gotten advanced Masters Degrees here in the United States --

Mr Rozenman: Objection as to foundation.

The Court: The question hasn't been finished. So, I'm going to to -- can you finish the question.

Ms Burgess: Certainly.

By Ms Burgess:

Q   Has it been your experience that those people have an unusual distrust of the police?

Mr Rozenman: Objection. Foundation.

The Court: Overruled. Go ahead

The Witness: No, that hasn't been my experience.

Nevertheless on redirect Sgt Britt testified that (Id at 76-77):

By Mr Rozenman:

Q   Sergeant, what does Masters Degree have to do with trust or distrust? What does Masters Degree have to do with trust or distrust towards the Police?

A   I think trust or distrust most of the time, from my experience, is based upon education...

Q   Do individual experiences, in your opinion, have any impact on trust or distrust of the Police?

&ast;     &ast;     &ast;

A   Certainly, I would say that's --

R.T. Id at 79:

Q   Okay, Isn't it true that even in American Police Force there's some unscrupulous policemen?

A   Well, certainly.

Q   Is it possible that somebody runs into those policemen? I mean meets them, deals with them, and has experience with them -- I mean, if they exist?

A   And I guess you're asking me can somebody have an encounter with such a police officer?

Q   Or officers?

A   It's possible.

Q   Officers --

A   It's possible that a person could.

Q   And is it possible there's more than one officer in entire country. You said officer. All I'm saying is this -- do we have one officer -- is it possible to have more than one officer that is unscrupulous in the entire country?

15

A   I would say most certainly there's probably more than one officer in the entire country that's unscrupulous.

The attorney for the respondents asserts that when "[p]olice arrested Defendant and served him later that day with a protection order from his ex-wife, and told him that his ex-wife and her family were safe [,] [a]t that time, Defendant told police that he was concerned that hit men hired to commit the murders might come looking for him (Limited Answer, p3-4).

The testimony that Petitioner allegedly made such statement came from det. Rapael Egea. At trial, under cross-examination, det Egea provided the following testimony, R.T. 03/25/13 at 92-93:

Q   By Mr. Rozenman: Detective, you told us that you and I had three interactions; is that correct?

A   As I recall, yes.

Q   And the first interaction was the death notification, and the second interaction was in custody interrogation, correct?

A   Correct.

Q   Did you record the first interaction?

A   The one at your apartment?

Q   Did you audio record the first interaction?

A   And I'm asking you to clarify that. At your apartment?

Q   Yes.

A   Yes.

Q   Did you record the second interaction?

A   At?

Q   At the police station.

A   Yes.

16

Q   Did you record the third interaction?

A   I did not.

Thus det Egea's testimony that Petitioner allegedly stated that the hit men hired to commit the murders might come looking for him (R.T 03/25/13 at 76) is entirely uncorroborated. Petitioner observes, however, only in passing, that det Egea's testimony strains credulity. If Petitioner is served with a protection order from his ex-wife, then it means the ex-wife is alive. If the ex-wife is alive (regardless whether Petitioner is guilty or innocent) then that means there are no hit men. Moreover this is reminiscent of a bad Hollywood movie where someone breaks into prison looking for a suspect. It is incredulous.

It is important to note that the attorney for the Respondents did not address the most crucial point of the surveillance — that now since recordings have not been impounded Petitioner's responses on the HAWK recording, ex.96, to proposition to have his ex-wife and her family murdered (at 14 min, 38 sec) or to have her shot (at 16 min, 16 sec) are entirely inaudible.[2]

The point of this rebuttal is not to demonstrate that trial evidence contradicts the jury's verdict, but that, taking the evidence as a whole, it was the jury's reliance on the reliability of the recordings that was the straw that broke the camel's back. Had Petitioner been able to bring forth evidence that undermines the trustworthiness of the recordings, the verdict undoubtedly would be different. This is further supported by the 11/22/10 minute entry of a judge who presided over

Footnote 2: Since Petitioner does not have a transcript of the audio/video recording with a time column, he can only indicate the time on the HAWK.

the first trial stating that (SEE p.5, bottom para) "[R]ecordings of meetings and telephone conversations in which defendant took part were crucial evidence used by the State in building its case." Similarly, following the second trial a different judge, who presided over the second trial, in his 09/28/16 minute entry made a finding that (SEE p.3, para4) "the integrity of the evidence was a crucial issue addressed at trial."

The attorney for the Respondents misnames the titles of some of the Petitioner's claims, in Appellant's Supplemental Brief in Propria Persona, filed on direct appeal with the Court of Appeals. Additionally the attorney for the Respondents foregoes some of the claims. The misnaming of the claims while foregoing of some of them is probably the root of the attorney for the Respondents' conclusion that Petitioner did not present ground three, four and five to the state court. See Limited Answer, p.5.

The Appellant's Supplemental Brief in Propria Persona is Respondents Exhibit CCC. The claims are listed on p.1 and 2 of the Brief. They are:

1. Failure to Preserve Evidence Constitutes a Denial of Due Process When Police Exercises Bad Faith in Non-preservation of Evidence, Which Might Have Exonerated the Defendant.

2. Verdict Contrary to the Weight of the Evidence.

3. Trial Court Erroneously Overruled Defendant's Objection Which Entirely Overturned the Meaning of Crucial Evidence at Trial.

4. Witness Tampering and Erroneous Admission of Recordings as Evidence at Trial.

5. Obstruction of Justice and Erroneous Ruling by Judge Hoffman.

6. Brady Violation: Police Rules and Procedure.

7. Newly Discovered Evidence: Police Rules and Procedure.

8. Brady Violation: Non-Disclosure of Jeff Smith's Report.

9. Error by Trial Judge Not to Allow to Interview the State's Sound Expert Prior to Trial.

10. Knowing Use by Prosecution of Perjured Testimony in Order to Secure a Conviction Violates Constitution.

11. Erroneous Denial of Defendant's Motion in Limine Where Defendant Sought Preclusion of Recordings into Evidence.

12. Error by Trial Judge Not to Allow Attorney Ferragut to Testify at Trial.

13. Error by Trial Judge Denying Defendant's Transcript to Be Used at Trial.

14. Discovery Violation Under Rule 15.1/ Abuse of Discretion by Trial Judge.

The attorney for the Respondents lists the Court of Appeals' findings, but fails to inform this Court that the Court of Appeals failed to review claim 5 — Obstruction of Justice and Erroneous Ruling by Judge Hoffman.

Although the Federal District Court looks at the last reasoned opinion of the state court in examining the reasonableness of the state court's decision, YLst v Nunnemaker, 501 U.S. 797, 805, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991), it is important to note that the attorney for the Respondents substantially mischaracterized several of the Court of Appeals findings pertaining to the claims arising out of post-trial discovery of Operations Order 8.1. Since in the First Amended Petition only grounds 1 and 2 pertain to post-trial discovery of Opera-

tions Order 8.1, Petitioner points only to those direct appeal claims that have to do with post-trial discovery of Order 8.1 and were later presented as claims to this Court. These claims are: (1) Failure to Preserve Evidence Constitutes a Denial of Due Process When Police Exercises Bad Faith in Non-Preservation of Evidence, Which Might Have Exonerated the Defendant and (6) Brady Violation: Police Rules and Procedure. In the Court of Appeals' decision these claims were grouped together and discussed on p6-8 of the decision.

In the decision these claims are preceded by a discussion titled "Delay in Impounding Recordings." This discussion specifically focuses on the fact that Petitioner failed to present expert witness testimony pertaining to post-trial discovery of Order 8.1: "Insofar as the record reflects, however, Defendant did not supply any expert or other witness who testified that such policy [Operations Order 8.1] was violated by the conduct of the detectives in this case." (See p7, top para.)

More specifically, under a heading "Youngblood Claim" (see p7-8), the Court of Appeals emphasized that "Defendant has failed to persuade us that the investigating officers did so [i.e. not impounding evidence] in bad faith." Petitioner took this and the preceding statement to mean that it will take an expert witness testimony, regarding Order 8.1, to persuade the court that detectives acted in bad faith.

Pertaining to Brady violation the Court of Appeals was even more direct: "The record fails to reveal any testimony to support Defendant's claim that Operations Order 8.1 applies to the recordings at issue, that the investigating officers lied in testifying that it was common practice to retain surveillance recordings (rather than send them to the impound warehouse)

while investigating the offense, or that anyone tampered with the record-
ings during the four months they were not impounded. Under these circum-
stances, we are not persuaded that Operations Order 8.1 was evidence mate-
rial to his guilt, as required to establish a Brady violation." (See p8, bottom para)

Thus, contrary to the attorney for the Respondents' assertion that the
Court of Appeals made a finding that "the State did not violate Brady as re-
lated to the police policy regarding impounding evidence because it was
not material," the Court of Appeals stated that it will take an expert
witness testimony to prove to the Court of Appeals that Operations
Order 8.1 means what it says.

Just as attorney for the Respondents misnamed and miscounted the
claims Petitioner filed with the Court of Appeals, similarly the attorney
for the respondents misnamed and miscounted the claims filed with
the Rule 32 Court in Petition for Post-Conviction Relief.

In Petition for Post-Conviction Relief (Respondents' Ex FFF–JJJ, LLL–
MMM) Petitioner raised the following claims: (1) Brady Claim (p5, Peti-
tion); (2) Youngblood Claim (p15, Petition); (3) Tampered Evidence (p21, Petition);
(4) Knowing Use of Perjured Testimony Violates Due Process (p22, Petition);
(5) Results of PSB–Internal Affairs Investigation (p22, Petition).

It is notable that the attorney for the Respondents' partial citation of
the PCR court ruling includes the focal point – that the integrity of evidence
was a crucial trial issue. (Limited Answer, p6, para 2).[3]

Footnote 3: The judge who presided at trial was the same judge who made the
PCR findings.

Rebutal to Respondent's Assertion That Ground Five is Non-Cognizable.

Ground 5 is based on Petitioner's Motion to Compel Personnel Files. The motion arises out of Professional Service Bureau's (PSB) investigation into conduct of detectives Warner and Egea during the prosecution of this case. See letter attached as an exhibit to the Motion (Resp. Ex G of Doc 33) from PhxPD) indicating the inquiries: INQ10-0629, PHN10-0211, INQ11-0706, PHN13-0247 and INQ14-0755.

The attorney for the Respondents asserts that Grounds 5 is non-cognizable because it is not based on violation of the Constitution or laws or treaties of the United States. (Limited Answer, p10)

This assertion is erroneous.

In Motion to Compel Personnel Files (Resp. p2 of Ex G of Doc 33), filed during the Rule 32 proceedings, Petitioner stated that "the results of PSB investigation are likely to be contained in personnel files." In support of the fact that personnel files should be disclosed and examined by the court Petitioner relied on Canion v Cole ex rel. County of Maricopa, 208 Ariz. 133, 138, 91 P.3d 355, 360 (App. 2004), which states: "The defendant's right to due process with regard to the disclosure of exculpatory evidence does not cease to exist after the verdict is rendered; the prosecution has a continuing duty to provide such evidence... in the context of a PCR proceeding." In Canion the court relied on Mooney v Holohan, 294 U.S. 103, 112, 79 L.Ed. 791, 55 S.Ct. 340 (1935) in support of the proposition cited above.

Furthermore, in the same motion Petitioner asserted (see p3) that the court should examine the files for "Letters of reprimand [that] bare on credibility of the officers, especially Letters of reprimand in regards to non-preservation of evidence, dishonesty, deception, concealment or violation of constitutional rights."

"A petitioner can take four actions in its brief which are significant to the determination as to whether a claim has been fairly presented:

(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." Clinkscale v Carter, 375 F. 3d 430, 437 (6th Cir 2004); Levine v Torvik, 986 F. 2d 1506, 1516 (6th Cir.), cert. denied, 509 U.S. 907, 125 L.Ed.2d 694, 113 S. Ct. 3001 (1993).

Thus in the Motion Petitioner relied on state law and on the facts well within the mainstream of constitutional law for proposition expressed in Brady v Maryland, 373 U.S. 83, 88 (1963), that prosecution has an obligation to turn over any exculpatory and impeaching evidence.

Furthermore, in the application of the First Amended Petition (see Attachment A, p2), at the very top of the page it states that "[t]his is a due process claim under the XIV Amendment." In the supporting facts portion of the application Petitioner stated that "[t]he results of these investigations can reasonably lead to yet another Brady material."[4] The supporting facts in Attachment A, p2 are replicated word for word in Attachment B, p69-70 and thus once again invoke the fact that "the results of these investigations can reasonably lead to yet another Brady material," i.e. the evidence that is either exculpatory or evidence that can be used to impeach detectives Warner and Egea. Thus in the First Amended Petition Petitioner invoked a denial of a specific constitutional right (XIV Amendment) and alleged the facts well within the mainstream of constitutional law — that prosecution has a duty to disclose Brady material.

Next, the attorney for the Respondents, relying on Franzen v Brinkman, 877 F. 2d 26 (9th Cir. 1989) and on Gerlaugh v Stewart, 129 F. 3d 1027, 1045 (9th Cir 1997),

Footnote 4: Brady v Maryland, 373 U. S. 83, 88 (1963).

asserts that the Rule 32 Court's failure to examine the personnel files is an error in a State PCR proceeding and as such it is not cognizable in a federal habeas corpus action. In FRANZEN and in GERLAUGH petitioners attempted to elevate the error in state PCR to a federal constitutional status. In both FRANZEN and GERLAUGH petitioners did not allege a violation of the United States Constitution or laws or treaties of the United States. Since in the First Amended Petition Petitioner did allege the violations of the United States Constitution and the law of the United States, the assertion of the attorney for the Respondents that Petitioner's claim is based only on state law fails.

In the cases governed by 28 U.S.C. §2254 discovery is available in the discretion of the court and for good cause shown. Rich v Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999). "Good cause exists where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is... entitled to relief." BRACY v GRAMLEY, 520 U.S. 899, 908-09, 117 S. Ct. 1793 (1997).

The attorney for the Respondents is correct in asserting that in determining whether the state court unreasonably applied federal law this Court is limited to the state-court record. But the examination of application of the federal law is only one of two prongs under which relief can be granted. The other prong is under §2254(d)(2) and applies when the adjudication of the claim resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

"Where a state court's decision is unaccompanied by an explanation [such as in this case], the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011).

24

The relief that Petitioner sought was to examine the detectives' personnel files. The Rule 32 Court's summary dismissal of this discovery request must imply that the Rule 32 Court must have assumed that no Brady material — whether exculpatory or impeaching — in the detectives' personnel files would form basis for relief. There was no reasonable basis for the state court to make such presupposition, under the circumstances of this case, without first making a preliminary examination of the personnel files.

Since the Rule 32 Court, in its 09/28/16 minute entry, Respondents Ex NNN, made a finding that "the integrity of the evidence was a crucial issue" at trial, it therefore follows that the integrity of detectives Warner and Egea, who were in possession of not impounded recordings, was crucial as well.

The inquiries' first two digits must stand for the year the investigation was conducted (see p 22 of this Reply, e.g. INQ 10-0629). Three of the inquiries predate the trial, while one was performed the year of the trial. The Professional Service Bureau's findings and any other evidence that predates the trial in the detectives' personnel files, that reflects negatively on detectives' credibility, would be a Brady material of the first magnitude and by its nature would be of great importance to a jury in assessing the credibility of the detectives and thus the integrity of not impounded recordings. Hence, there was no reasonable basis for the Rule 32 Court to deny Petitioner's request to examine the personnel files.

In assessing whether a state court's application of law or determination of fact is "unreasonable," the court cannot simply consider whether it would have reached a different outcome on the same record. Rice v Collins, 546 U.S. 333, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006). Rather, "[t]he 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." Lockyer v Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). It requires the decision to be "objectively unrea-

sonable." Id.

Any court to whom the defect in the state court's decision is pointed out would be unreasonable in holding that the state court's summary dismissal of the request to examine the personnel files was reasonable.

Therefore Petitioner respectfully asks this Court to examine the detectives' personnel files for Professional Service Bureau's findings and any other Brady material.


## Rebuttal to the Respondents' Assertion that Grounds Three, Four and Five are Procedurally Defaulted.

The attorney for the Respondents asserts: "In Ground Three, Petitioner argues that the State violated the Fourteenth Amendment based on "The Law of Case Doctrine." (Doc. 5 at 8). In Ground Four, Petitioner argues that his right to Compulsory Due Process was violated as a result of the State trial court precluding "Attorney Farragut" to testify. (Id. at 9). In Ground Five, Petitioner argues that his "due process rights were violated based on the results of [a] Professional Service Bureau... Investigation. (Id. at 14.) Petitioner, however, never presented these claims to any level of State court, and thus, the claims are technically exhausted but procedurally defaulted for the following reasons: (1) they were not fairly presented to all levels of the state courts as federal constitutional claims; and (2) Arizona's procedural rules now preclude Petitioner from returning to state court to exhaust this claim [sic: these claims] in any subsequent Rule 32 proceedings."

It is important to note the obvious contradiction in the above cited passage: "Petitioner... never presented these claims to any level of state court" oppose to "they were not fairly presented to all levels of the state courts as

federal constitutional claims." (Limited Answer, p15.)

Petitioner first addresses whether in order to exhaust the claims, to have them presented for federal review, Petitioner had to present them to "all levels of the state courts as federal constitutional claims."

This matter was thoroughly researched and addressed in Crowell v Knowles, 483 F.Supp. 2d 925 (Dist. Ariz 2007). This case held that for purpose of federal review, once a life sentenced prisoner presented his claims, the Arizona Court of Appeals, the claims are considered exhausted.

Ground Three is based on the Law of the Case Doctrine. As Petitioner's application portion of the First Amended Petition before this Court states (see p8): This ground was titled 'Obstruction of Justice and Erroneous Ruling by Judge Hoffman' on direct appeal. However, a title 'The Law of the Case Doctrine' is more appropriate considering an issue at hand.

In the Court of App. this claim was based on the same legal theory and the same operative facts as in this Court — during the trial det Warner recited for the jury erroneous conclusions of Judge Hoffman and defendant was therefore prejudiced by recitation of such conclusions. In relevant parts in the Court of Appeals under a title "Obstruction of Justice and Erroneous Ruling by Judge Hoffman" Petitioner stated (see p 13-21 of Appellant's Supplemental Brief in Propria Persona, Respondents exhibit CCC): "At trial (R.T. 04/03/13 at 72-73) when defendant questioned DW if he suppressed the Hawk recording DW, despite objection by the defendant, read to the jury erroneous ruling by Judge Hoffman that HAWK recording was disclosed on Supplement 20 and that defense counsel knew of the HAWK recording (R.T. 04/03/13 at 74-75). This in essence prevented impeachment [of] DW on that very same issue. Such ruling is clearly erroneous especially when analysing 02/10/10 interview between defense and DW (see attached interview pages 3-11 as part of [attachment to] Motion to Vacate Judgment). During the interview DW   repeatedly tells defense that there are

only 2 recordings — audio/video and HAWK. If defense at the time has 2 recordings, one of which is easily identifiable as [an] audio/video, then how is defense attorney supposed to figure out that the other recording in his possession is not HAWK?

Naturally defense attorney would presume that the other recording must be HAWK. Not only Judge Hoffman's ruling failed to account that there was no way for defense to figure out that HAWK was a recording it does not have, but it [the ruling] failed to account for the fact that DW intentionally misled UF [Ulises Ferragut - the defense attorney] to believe that what is in his possession is audio/video and HAWK, while what defense in fact had in his possession [was] audio/video and transmitter.

Defendant was prejudiced by DW reading erroneous ruling to the jury and [thus] did not receive a fair trial in violation of [the] XIV Amendment of [the] U.S. Constitution and Art 2, §4 of Arizona Constitution."

Thus it is clear-Petitioner did present this claim to the Court of Appeals and presented it properly, for purpose of exhaustion, by invoking the XIV Amendment of the United States Constitution.

Granted, in the First Amended Petition this claim is presented in a more thorough manner — substantiated by additional facts and case law, but in order to fulfill exhaustion requirement, a petitioner must present to the state court the "substantial equivalent" of the claim presented in federal court. Picard v Connor, 404 U.S. 270, 278, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971). "[S]tate courts have been given a sufficient opportunity to hear an issue when the petitioner has presented the state court with the issue's factual and legal basis." Weaver v Thompson, 197 F. 3d 359, 364 (9th Cir. 1999). However, a petitioner may provide further facts to support a claim in federal district court, so long as those facts do not "fundamentally alter the legal claim already considered by the state courts." Vasquez v Hillery, 474 U.S. 254, 260, 106 S. Ct. 617, 88 L. Ed. 2d

588 (1986).

Ground Four is based on Compulsory Process Clause where the state trial court precluded testimony of attorney Ferragut who represented Petitioner during the first trial and who, on several occasions, interviewed det Warner.

Pertaining to Ground Four Petitioner in the application of the First Amended Petition (see p 9) stated: "This ground was titled 'Error by Trial Judge not to allow attorney Ferragut to testify at trial' on direct appeal in both courts — the Court of Appeals and the Supreme Court of Arizona. However, Compulsory Process Clause is a more appropriate title, considering the issue at hand."

In Appellant's Supplemental Brief in Propria Persona, Respondents exhibit CCC, this claim was presented on p 34-36. It states: "On 04/03/13 defendant I during the trial I questioned DW if he suppressed a third recording of surveillance (R.T. 04/03/13 at 73). Despite objection by the defendant DW stated (Id 73-75): No, I did not and I have a court entry from a judge in a previous matter... There was a previous hearing the judge stated, and I quote, 'the second is that the defense exercised due diligence, the HAWK CD was disclosed in supplement 20 of Phoenix Police Department report... Defense counsel saw the HAWK CD in the Phoenix Department of Property Management... on January 7, 2010, and did not request a copy of the HAWK CD. The defense counsel was aware of the HAWK recording and referred to it in its pre-hearing interviews with detectives Carmody and Warner."

Since the ruling, being clearly erroneous, does not take into account that DW and DC succeeded into [sic: in] misleading attorney Ferragut that HAWK recording is one of the recordings attorney Ferragut already has, the only remedy at that point was to have attorney Ferragut testify that he was misled by DW on the number of recordings and that DW misrepresented to attorney Ferragut that HAWK was one of the recordings defense already had. Defendant argued that he should be able to present

29

those facts through testimony of attorney Ferragut (Id at 87, 93-96).

While outside the presence of the jury attorney Ferragut testified that he was misled [previously] by DW on [sic: as to] how many recordings existed and that he was led to believe that HAWK was a recording defense already had (Id at 108-109).

Initially the Court was inclined to allow the defendant to establish, through attorney Ferragut, how attorney Ferragut learned of a third recording (Id at 116-117), but following an argument by the State, that Judge Hoffman found no intentional misconduct by DW and DC [det Carmody], the Court precluded the defendant from being able to establish those facts through examination and testimony of attorney Ferragut (Id at 125-126).

Preclusion of testimony of attorney Ferragut was an error by trial judge, because defendant, following DW reading [the] erroneous ruling by Judge Hoffman, was not able to establish to the jurors the intentional suppression of a 3rd — HAWK recording — in which DW willingly engaged. Had defendant been able to establish the above cited facts, through testimony of attorney Ferragut, a reasonable juror would not have confidence in credibility of DW and the recordings in his possession.

Here, the defendant's right to present his defense was violated as gua-ranteed under the VI Amendment of [the] U.S. Constitution and Art 2, § 24 of Arizona Constitution."

Here too, petitioner presented to state court the operative facts of the claim, buttressed by legal theory, where petitioner should have been allowed to present his defense, and the violation of the VI Amendment of the United States Con-stitution, thus satisfying the exhaustion and the necessary requirement for the claim to be considered as fairly presented to state court on federal consti-tutional ground.

Ground Five, as already stated supra, is a request to have the personnel

FILES EXAMINED.

As discussed above, the attorney for the Respondents has alleged that Ground Five is non-cognizable being based supposedly on nothing more than an error in a state PCR proceeding. Petitioner, however, has already addressed the fact that in his Motion to Compel Personnel Files, filed with the Rule 32 Court, he has fairly presented this claim as federal.

In Petition For Review Before Arizona Court of Appeals, Respondents Exhibit OOO, this claim is on p18-19. In the Court of Appeals Petitioner once again presented this claim as federal by stating that "[t]his motion can reasonably lead to yet another Brady material." More importantly in Conclusion (see p19) Petitioner stated: "The claims set forth in this Petition are Federal in nature and are based on violation of V and XIV Amendments of [the] U.S Constitution."

Since Petitioner in Petition for Review Before the Court of Appeals brought forth the fact that this claim is based on a denial of a specific constitutional right (V and XIV Amendments) and brought forth the fact that this claim is well within the mainstream of constitutional law (the Brady doctrine), Petitioner fairly presented this claim as federal in the Court of Appeals and had this claim exhausted for purpose of federal review.

Rebuttal to the Analysis by Attorney for the Respondents That the State Court's Rejection of Petitioner's Claim That the State Failed to Preserve Evidence Was Neither Contrary to, Nor an Unreasonable Application of Federal Law, Nor an Unreasonable Determination of the Facts.

The attorney for the Respondents' analysis of this claim begins on p22 of Limited Response. The attorney for the Respondents writes (Limited Response, p23):

"To constitute a due process violation, the destroyed evidence must have an exculpatory value that was apparent before it was destroyed and be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Youngblood, 488 U.S. at 58 (quoting California v Trombetta, 467 U.S. 473, 489 (1984)... In addition, the defendant must demonstrate that the law enforcement officers acted in bad faith to preserve the evidence."

The alleged fact, that "[t]o constitute a due process violation, the destroy- ed evidence must have an exculpatory value that was apparent," Respondents do not support by any case law. Moreover it is contradicted by Youngblood hold- ing; Id at 51 and by Youngblood dicta, Id at 56-58.

The holding states that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id at 51. The obvious infer- ence is that when evidence is not preserved it's value can be only "potentially useful." The dicta explains: "The reasoning in... the instant case mark[s] a sharp depar- ture from Trombetta... First, Trombetta speaks of evidence whose exculpatory value is "apparent"... The possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of consti- tutional materiality in Trombetta. Second, we made clear in Trombetta that the excul- patory value of the evidence must be apparent "before the evidence was dest- royed"... Here, respondent has not shown that the police knew the semen samples would have exculpated him when they failed to perform certain tests..; this evidence was simply an avenue of investigation." Id at 56. "Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exone- rated the defendant." Id at 57.

It therefore follows that "requiring a defendant to show bad faith

32

on the part of the police limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id. at 58.

The attorney for the Respondents' argument is threefold.

First, he argues that Petitioner "points to no evidence establishing that the location of storage affected the quality, or that anyone actually tampered with the recordings." (Limited Answer, p24).

When tampering can be proven Youngblood is inapplicable. State v Jordan, 73 Ohio App. 3d 524, 597 N.E. 2 d 1165, 1169 (1992). Indeed, what would the purpose of drawing inference from bad faith of the detectives be, if there is evidence of tampering? It is "bad faith... that turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed [or not preserved]." Youngblood at 56. Thus the inference that non-preserved evidence was exculpatory is drawn from actions of the detectives, not from the fact that there is evidence of tampering. Moreover, nowhere in Youngblood does it state that in order to establish that the non-preserved evidence was exculpatory, petitioner, in addition to bad faith, also needs to prove that police tampered with the evidence.

The attorney for the Respondents next asserts (Limited Answer, p24) that "Petitioner's entire argument appears to be that, because Warren [sic: Warner] kept the recordings in a locked drawer at the police station rather than in an evidence warehouse 20 miles away, the recordings were more susceptible to tampering, and thus not trustworthy, and if the officer had transferred the recordings to the warehouse, perhaps they may have been more audible and thus exculpated him."

The Attorney for the Respondents' assertion is a twofold misstatement. First, it misstates the trial record, then it misstates Petitioner's argument. At trial det Warner testified (R.T. 03/26/13 at 154, Respondents' ex Z) that he shared the recordings with a "myriad of people" because it was needed.

Q  Who else needed to listen to that recording?
A  The County Attorney's Office, other detectives involved in the case, supervisors. A myriad of people.

Though the trial record is void of an explanation why det Warner, instead of sharing the recordings with a myriad of people, did not impound the recordings and shared copies instead, it would be a misstatement of record to say that while recordings were not impounded det Warner "kept the recordings in a locked drawer". Although there is testimony that when the recordings were not busy being listened to by a myriad of people and not being on the move while a myriad of people were sharing them back and forth, at that time recordings were supposedly locked in a draw. Id at 156.

It is also a misstatement of Petitioner's argument to say that his non-pre-servation of evidence claim rests on the fact that keeping recordings in a warehouse, rather than sharing them with a myriad of people, would make them more audible. Rather, Petitioner's central argument is that detectives Warner and Egea at trial, while under oath, lied and misrepresented to the jury that evidence does not need to be impounded.

At trial det Warner testified (R.T. 04/04/13 at 29-30, Respondents' ex EE) that the recordings of the surveillance and confrontation calls from KY were not impound-ed for over four month:

Q By Mr Rozenman: I asked you, did you impound the recordings of the

surveillance four months and four days afterwards, and correct me if I'm wrong, you said, yes?

A   I don't believe that's exactly how you stated the question, but yes, the recordings were impounded four months later.

Q   And isn't true that the calls from Kentucky were also impounded four months and four days later?

A   I don't recall the date that they were impounded. The calls that -- that I don't recall.

Q   But would that be consistent with what happened in this case?

A   What is consistent with what happened in this case?

Q   That the recordings of the surveillance and the calls from Kentucky were impounded to the impound four months and four days -- well, four months later?

   MR EAVES: Objection, vague.

   The Court: Four months later than what?

Q   By MR ROZENMAN: Okay. They were impounded on June 16th, 2009. Everything was actually impounded on June 16, 2009?

   MR EAVES: Objection, foundation, vague.

   The Court: You say everything was impounded, if you could be more specific.

   MR ROZENMAN: Yes, Judge.

Q   By MR ROZENMAN: Isn't it true the recordings of the surveillance and the calls from Kentucky, or the CDs marked confrontation calls from Kentucky were also impounded on June 16, 2009?

A   I'm looking at the invoice, I'm looking at supplement 20 of the original report.

Q   I have a copy if you need one.

A   Nope, I have it right here. That's when everything was impounded.

Det Warner testified (R.T. 03/26/13 at 156-157, Respondents' Ex Z) that the reason why he did not impound the recordings of surveillance and calls from KY is because evidence should remain with case agent rather than in the impound.

Q   All right.
   Now, you've heard Mr Rozenman throw around the term "chain of custody" a few times, haven't you?
A   Yes, I have.
Q   All right. Now, let's talk about that a little bit. When we're talking about chain of custody, there are some people who are allowed to have evidence during the course of an investigation, aren't there?
A   Yes, there are.
Q   And who are those people?
A   The case agent, myself, any other detective involved in the case, and the County Attorney.
Q   So if the case agent has a piece of evidence in his custody, it's not a break in the chain of custody, is it?
A   No. No.
Q   In fact, that's what the chain of custody says, is that the evidence should remain in the case agent's hands?
A   Yes.

   But evidence should not remain in case agent's hands and per Operations Order 8.1 must be impounded prior to the end of shift.
   Similarly, det Egea testified that (R.T. 03/25/13 at 142-144, Respondents' Ex Y) the recordings of the in-custody interrogation and the "death notification" were not impounded for over a month.

Q  Now, you told us that when you seized the recordings of the in-custody interrogation and the death notification, that you didn't impound it for over a month. Do you remember telling us that?

A  Yes, sir.

Q  Why didn't you make a copy?

A  Why didn't I make copies?

Q  Yeah. Why didn't you make a copy and impound the originals?

A  I did make copies.

                    *          *          *

Q  My question to you stays the same. Why not make copies and impound the originals to protect the integrity of the evidence?

A  Because that original is the copy that I wanted to work with on this investigation, and when I was done with that piece of evidence that's when it was impounded.

                    *          *          *

Q  Well, you wanted to work with the original rather than the copy. Can you tell me why?

A  Because that's the original that I chose to do it with.

Q  I'm sorry?

A  That's the original that I chose to do it with.

Q  So it was just you choosing—— so you preferred to work with the original rather than with the copy, right?

A  Correct.


   Not only did det Egea chose to violate Operations Order 8.1, that requires all evidence to be impounded prior to the end of shift, but he provided false information that in order to impound the recordings he supposedly would have to endure a 40 mile round trip - from I-17 and Bell rd to impound

37.f

facility (Id at 84, RESPONDENTS EX Y):

Q   About how long did it take before you put it into impound?

A   I think it was a little over a month, I may have impounded it in March of 2009.

Q   And why did you wait that long before putting it into impound?

A   Well, in this case I had a taped interview that I needed to listen to that was part of a very complicated investigation, which involved other detectives who had worked in different portions of this investiga- tion. So we wanted, obviously, to share that information.

Also, logistically it made no sense, where we were located at the I-17 and Bell to our impound area is about a 40 mile round trip. So for me to go every time I needed this piece of evidence to review it would be ridiculous for me to drive 40 miles, pick it up, bring it back it [sic] my office, open package, and then listen to it again...

In his Reply to State's Response to Defendant's Petition for Rule 32 Relief, filed on May 26, 2016 (Resp. Ex C of Doc 33), Petitioner attached a notarized affidavit of Frank Rodgers. The affidavit states that Frank Rod- gers was an Assistant Director of the Phoenix Department Laboratory Bureau for 35 years. The affidavit further states that in order to impound evidence det Egea needed to travel only 4-5 miles to the nearest Property Annex and moreover could have requested for evidence to be picked up and returned back to him via email. Thus det Egea not only intentionally and consciously violated Operations Order 8.1, but also provided false informa- tion pertaining to the alleged hardship of a 40 mile round trip, he suppo- sedly would have to overcome, in order to impound the recordings. Worse, det Egea led jurors to believe that it is ridiculous to impound the

38

EVIDENCE.

Thus, contrary to attorney for the Respondents' assertion that Petitioner's claim rests on the fact that storing recordings in one place rather than another would somehow make them more audible, Petitioner's main argument, pertaining to this claim, rests on the fact that detectives Warner and Egea lied why they did not impound the recordings and therefore acted in bad faith.

In addition to the same argument the attorney for the Respondents asserts that "at trial, both Petitioner's and the State's forensic media experts testified that they found no evidence that anyone had altered or tampered with the recordings." (Limited Answer, p24)

The real question that needs to be entertained is not whether the state's and defense's sound forensic experts were able to determine that the recordings had been tampered with, but whether it is possible to tamper with this type of evidence and yet do so in such way that tampering cannot be detected? Because if the detectives lied why they did not impound the recordings and this is a type of evidence where tampering cannot be established, then in the presence of bad faith there is nothing to prevent an inference that "[t]he presence... of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed [or not preserved]." Youngblood, 488 U.S. at 56.

It is important to note that during the Rule 32 proceedings the prosecution did not contest the fact that recordings is a type of evidence that can be fairly easy to alter. See Response to Defendant's Petition for Rule 32 Relief, p9, Respondents' ex KKK. More specifically the prosecution argued that trial testimony of James Reams [defense sound forensic] established that recordings can be altered:

"Similarly, the March 10, 2016, affidavit by Gregg Stutchman also fails to constitute newly-discovered evidence that is material in any fashion...

Instead, Petitioner retained a different forensic audio/video analyst, James Reames, for trial. At trial, Mr Reames specifically testified that the HAWK recording device has proprietary software that is extremely difficult to alter or tamper with, but that you can actually change a HAWK recording with "sound on sound recording." Trial testimony of James Reames, April 16, 2013, p 27, l.11 - p 29, l.13.

Certainly, Petitioner elicited at the time of trial testimony regarding the ability to tamper with a HAWK recording, so Mr Stutchman's recent affidavit which essentially addresses the same topic adds no new facts to this matter. Further, Petitioner elicited testimony from his audio/video forensic expert at trial that one could tamper with data if given approximately four months to do so. See testimony of James Reames, April 17, 2013, p. 82, Lines 12-21. Thus, the recently-disclosed opinions of Mr Stutchman are not new, and were actually addressed at trial by Petitioner's chosen expert for trial." See p 9 of Response to Defendant's Petition for Rule 32 Relief, Respondents' ex KKK.

Thus, the issue whether or not recordings can be altered was not an issue of debate during the Rule 32 proceedings.

On this topic the 2nd Circuit court observed that "[t]ape recorded evidence is uniquely susceptible to manipulation and alteration. Portion of a conversation may be deleted, substituted or rearranged. Yet, if the editing is skillful, such modifications can rarely, if ever, be detected." United States v Gigante, 538 F.2d 502, 505 (2nd Cir. 1976).

It is important to note that at trial (R.T 04/16/13 at 98-99, Respondents' ex JJ) James Reams testified that, in a modern age, when recordings

ARE digital, it is even easier to tamper with the recordings than in 1976, when Gigante was published and the recordings were analog.

Q   Now you briefly touched the subject of digital recordings. Are digital recordings easier to tamper than analog recordings?

A   Yes. Basically if you were tampering with analog tape recordings, in the old days you'd have a pair of scissors and a splicing block and tape. And you would make copies of the tapes and cut them, put it together, and actually edit the tape that way.

With digital recordings you copy it into the computer, hard drive of the computer, and you can see the actual sample and you can essentially drop markers and just like a Word document you can copy, paste, delete, increase the process. You can do anything you want to to the recording.

James Reames testimony as to why with the recordings that are in evidence tampering cannot be established, rests on the fact that the recordings that are in evidence are not the original recordings that recorded Petitioner's voice be it during the surveillance, the confrontation call from KY, or the staged death notification.

The fact that recordings are not the original recordings that recorded the Petitioner's voice was established at trial through testimony of det Carmody, who was a technical surveillance officer and created the CDs that are in evidence. At trial he testified (R.T. 04/23/13 at 42-43, Respondents' Ex NN) that he created copies of the HAWK recording, Ex.96, that is in evidence:

Q   By Ms. Burgess: Shortly after the actual surveillance that night, February 13, 2008, you took the actual HAWK device, put it, hooked it up to

your computer or whatever system you used, and you created a direct download onto that disk; is that correct?

A   No, that's not correct.

&ast;            &ast;            &ast;

The Witness:   Yeah. It actually gets downloaded to the computer itself and then burned to the CD. The reason being to go direct to the CD takes a lot longer.

Similarly det Carmody testified that he created copies of an audio/video recording, Ex 37, Id at 48:

Q   And then can you also now turn to Exhibit 37 and let the jury know what that is?

A   (witness complies.) This is also a disk that I did. It has the date, my initials and serial number. And it's a CR write once read only. This would be one that I downloaded from the audio/video key fob.

&ast;            &ast;            &ast;

Q   So that's the key fob. And is that an analog or digital recording?

A   It's a digital.

Q   Okay. And can you tell us what you did when you received the key fob to create that download?

A   Basically this device, you would plug into it and it looks at actually almost -- probably an easy way to understand it is it's almost like you plug into a thumb drive but you have to use, I believe, quick time to download the audio off of it, unlike the HAWK, where you have to use proprietary software. So I would download it to the computer and burn it to the CD.

And when it comes to the transmitter recording of the surveillance, though

that recording is largely inaudible, det Carmody also testified that he burned the recording from the device onto a CD, Id at 40-41.

Q  Okay. In fact, you did ultimately record some of the, or all of the transmission that you were getting?

A  Correct.

Q  But it was terrible quality, wasn't it?

A  Correct.

Q  Not usable.

A  Correct.

Q  And after the entire surveillance was over, you were given ——the transmitter piece that did the recording with you?

A  I had the receiver end, yes, ma'am.

Q  Okay. So you didn't need that in order to create a download? You didn't need to get something from Levi or from Detective Warner?

A  No.

Q  But you did need to get two devices from them to download?

A  Correct.

Q  The HAWK [ex 96] and the key fob [ex 97]?

A  Correct.

Q  Okay. And you took all three of those and you performed down- loads shortly after the actual surveillance took place?

A  Correct.

There are no original recordings in evidence. The original recordings stayed on the devices. All that's in evidence are CDs, which are copies of the recordings produced by the devices.

At trial James Reams explained why, in absence of an original recording,

that had been impounded right away, it is impossible to determine tampering (R.T. 04/17/13 at 22-23, Respondents' Ex KK):

Q  In the absence of original recording that had been impounded right away, that you know it's 100 percent original, can you tell with 100 percent certainty whether a recording had or had not been tampered with?

Ms Burgess: Objection; relevance, foundation.

The Court: Overruled. If you can answer, go ahead.

The Witness: Basically the answer is a copy you can never be sure. Because what happens is, if you find an alteration in a copy, the alteration could have occured in the copying process.

On cross-examination by prosecution this matter was affirmed once again, Id at 82:

Q  Okay. And you are not offering any opinion in this case that the recording on the key fob or on the HAWK were in any way altered or tampered with, are you?

A  There was certainly anomalies on the tape. In other words, there were anomalies but establishing that they were alterations, definite alterations, I could not. Because you can't establish definitely a copy recording for the Nano cam or the HAWK as altered or not altered.

Q  Let's be clear. You will not come in and say to a reasonable degree of scientific probability that you can find any actual alterations or tampering with those tapes?

A  That's correct, because it's a copy.

Out of all recordings in evidence, at trial prosecution suggested that one recording — a video taken from across the street, that shows Petitioner meeting with Levi Najar[5] — was created by recording the video directly onto a CD (R.T. 04/17/13 at 64-65, Respondents' ex KK):

Q    Were you aware that the video from the police van is, in fact, the original recording, that the video cameras recorded directly onto that disk?

Mr Rozenman: Objection, Your Honor. I ask her to define the word original.

The Court: Well, she just asked if he's aware. It's yes or no.

The Witness: No, I was not.

Presuming this particular disk is, in fact, an original recording, it does not affect the fact that all other recordings could have been altered, because this particular video does not corroborate anything other than the fact that Petitioner and Levi Najar have indeed met. The fact that Petitioner and Levi Najar did meet on Feb 13, 2008 was not a point of contention at trial.

Now that the sufficient foundation has been laid, Petitioner proceeds to address the three assertions by attorney for the Respondents pertaining to the testimonies of the state's and Petitioner's sound experts (see Limited Answer, p 24-25).

The first assertion is that "Jeffrey Smith, the State's expert, testified: "it is not possible "to do anything to the data on the HAWK or key fob recordings, because the disks were "read only" (Exhibit U, at 16-18, 24). Furthermore,

Footnote 5: Jeff Smith, prosecution's sound expert, used that video to combine it with the HAWK audio, thus creating ex 109 (R.T. 03/14/13 at 35-37, Respondents' ex U).

Smith saw no indication that the data on the disks had bee altered or changed in any way from the time they were downloaded until the time that he saw them. (Id. at 23,115)." (limited Answer, p24)

It is indeed true that Jeff Smith, on direct examination, provided the testimony that it is impossible to do anything to the data since the disks are 'read only'. This obviously presupposes a fact that since the disks are 'read only' now they have always been 'read only'. But since recordings were not impounded for over 4 months the certainty of such assumption is questionable, especially since det Carmody, the technical surveillance officer who downloaded the recordings (see p41-43 of this doc.), provided false testimony to the Petitioner that rules for impounding evidence did not exist.(Id at 71-72) Smith on cross-examination admitted that he has not made any kind of determination to figure out if the disks in evidence are the ones that were originally downloaded.(R.T.03/14/13 at 104, Respondents' Ex U.)

Q  By Mr Rozenman: In any case, those disks that you received from Detective Warner, you haven't made any kind of determination to figure out if those are original from the recording?
A  No.


Most importantly, on cross-examination Smith provided testimony that was contrary to his earlier testimony that disks downloaded 'read only' cannot be altered. According to Smith within 4 months time all recordings can be altered. Altough his initial position was that all, but HAWK can be altered. Id at 79-80:
Q  But within the framework of time, let's say four months and four days, is it doable to manipulate the data? M-u-f-f, to muff out. Is. it doable to do that? Simple question.

If you have a person who is unscrupulous, he wants to muff out the data, the noise, the sounds, and he has four months of time on his hands, is that amount of time sufficient to be able to do if that's being

desired to be achieved?

A   In four months time, yes. But in order to do that to a HAWK record-ing, no. To do that to a 3GP file,[6] yes. To do that to a HAWK recording, no.[7]

Jeff Smith asserted that the HAWK recording cannot be tampered because (Id. at 81) according to him "the only way to edit that file is to export it as a wave [sic: WAV]. Once one exports it as a wave [sic] it can make mani-pulations, like I talked about, like a word processor, very easily. But they can't ever get it back into that file format."

Id at 81-82:

Q   When you talk about HAWK file format, the header is one of the things you look for for authenticity; is that correct?

A   Correct.

*          *          *

Q   By Mr Rozenman: And let's just put it like this and then I'm pretty sure the jurors can see it.

And if you look at this header all together, you told us earlier when prosecutor was questioning you that one of the things you look at for authenticity of the recording is the dates. Do you remember tell-ing us that?

A   Yes.

Q   And would you agree with me that the date on this particular one

Footnote 6: See 11/22/10 minute entry, p 4, Respondents' ex O, that explains that 3GP is an audio/video recording, trial ex 37.

Footnote 7: Pertaining to the HAWK recording Jeff Smith testified that he had "limi-ted knowledge" about HAWK. (R.T. 03/14/13 at 82, Respondents' ex U).

is sometime after the Civil War and sometime before the Russian Revolution in 1899.[28] ( See this Court's 11/26/18 Order, Doc 23-1. Doc 24-1 was also filed 11/26/18, but is not relevant here. Doc 23-1 acknowledges receipt of Jeff Smith's header with the date 12/30/1899. See also Notice of Clarification filed 12/03/18 by Petitioner.)

A    YES.

   It is important to observe that in his explanation how to tamper with the HAWK (Id at 81) Jeff Smith states that "the only way to edit that file is to export it ... make manipulations.... [and] get it back into that file format." But that explanation also starts with presupposition that there, in fact, was a HAWK recording created on the night of the surveillance and that recording would be the starting point from which the evidence would need to be altered. However, that presupposition does not include the fact that if on the night of the surveillance there was no HAWK record- ing, then it could have been simply created by taking any altered record- ing and playing it into a HAWK device. Once that is done there is obvi- ously no way of knowing if what had been recorded is a live conversa- tion or a conversation from another recording device. And as Stutchman's affidavit indicates, see p2 (Resp. Ex D of Doc 33) "[t]he date/time clock function of the HAWK recording is set by the computer which is attached for setup. The result is that the date/time of the recording will stem from whatever time the computer clock was set to." Thus a programmed date can give an altered recording a perception that it was recorded by a HAWK device on a date of the surveillance.

   Not only on cross-examination Jeff Smith admitted that in four

Footnote 8: As already had been mentioned in Attachment B (see p5-6) to the First Amended Petition, the AZ Court of Appeals, on direct appeal (see p13), misread this portion of trial transcript to mean that the header to which Petitioner referenced to  was not a header from Jeff Smith's report.

48

months time the 'READ ONLY' recordings could have been altered, and the HAWK file format is clearly wrong, but furthermore the assertion that the 'READ ONLY' recordings cannot be altered was contradicted by Stutchman's affidavit. See Resp. Ex D of Doc 33. The affidavit states (see p 3): "I have also been asked to elaborate on audio files burned to a one [sic: once] write CD.[9] The theory is that they cannot be altered or edited on the disc. However, the file(s) can be opened using commercially available software, and then burned to a new disc. Again, the computer clock could be changed to coinside with the time of the original recording in order to disguise the process."

The Stutchman's affidavit was filed after the Petition for Rule 32 Relief, on March 16, 2016. However, it was filed before the state's Response to Defendant's Petition for Rule 32 Relief. As already mentioned above the state not only did not contest the veracity of Stutchman's affidavit, but the state argued that the fact that recordings could have been tampered has already been addressed at trial by defense's sound expert James Reams. See p 9 of Response, Respondents' ex KKK. Nevertheless, in Reply to State's Response to Defendant's Petition for Rule 32 Relief (see p 8, Resp. Ex C of Doc 33) Petitioner addressed the state's argument pertaining to Stutchman's affidavit, and despite the fact that the veracity of the affidavit went uncontradicted, Petitioner asked (see p 10, bottom para) "to hold an evidentiary hearing, so that the defendant can present testimonies of expert witnesses under all claims in Petition for Rule 32."

Footnote 9: Although Jeff Smith refers to CDs as a 'READ ONLY' and Stutchman's affidavit bares a term 'one [sic: once] write' the difference in terminology is explained by the fact that when a 'once write' CD has something downloaded to it, it thus becomes a 'read only' CD.

Besides the fact that Jeff Smiths assertion, that the HAWK recording cannot be altered, was contradicted by his admission that the HAWK header has wrong dates, but such assertion was also contradicted by trial testimony of James Reames (R.T. 04/17/13 at 36, Respondents' ex KK ) who testified that the HAWK recording can be altered. Additionally Jeff Smith's assertion that the HAWK recording cannot be altered is contradicted by Stutchman's affidavit, Resp. Ex. D of Doc 33. The affidavit explains step by step how easy it is to tamper with a recording that some may believe to be tamper-proof.

The Rule 32 Court properly found that the integrity of evidence was a crucial issue at trial. See 03/28/16 minute entry, p3, Respondents' ex NNN. Even without Stutchman's affidavit the trial record provides sufficient evidence to cast doubt on Jeff Smith's assertion that 'read only' is a viable safeguard against tampering. James Reames testified that there are four safeguards against tampering ( R.T. 04/17/13 at 23-24, Respondents' ex KK), 'read only' is not one of them.

The attorney for the Respondents' assertion that Jeff Smith saw no indication that the recordings had been altered is explained not by the fact that there was no evidence of tampering, but by the fact that he chose not to perform the authentication analysis ( R.T. 03/14/13 at 72, Respondents' ex U) and chose not to make any kind of determination that the disks were those that were originally downloaded (Id. at 104). Having stuck his head in a sand he obviously could not provide a genuine testimony that he did not find evidence of tampering.

The attorney for Respondents' second assertion is that "[a]lthough Petitioner's expert, James Reames, argued, unless a recording is an "original," one can never be absolutely certain it has not been tampered with, Reames conceded that — in this case — he did not check either the HAWK or the key fob for changes or alterations. ( Exhibit KK, at 22-23, 66; see also id. at 75-76) Thus, he did not (and could not) testify that any alteration had occured." (Limited Answer, p25.)

The assertion above is entirely correct. As James Reames testified (Id at 23) he

could not check alterations in a copy "[b]ecause..., if you find an alteration in a copy, the alteration could have occured in the copying process."

It is important to note, though, that since detectives were handling evidence where tampering cannot be established, the strict adherence to procedure for preservation of it was increasingly important.

The attorney for the Respondents' third assertion is that "[b]oth Smith and Reames agreed that the HAWK was developed for law enforcement use and employs a "proprietary software structure" to protect against tampering. (Exhibit U, at 80, 102-03; Exhibit KK, at 68.) Smith further noted that, given the HAWK's "proprietary format," "authentication questions can't really arise." (Exhibit U, at 80, 102-03.) "(Limited Answer, p 25).

Petitioner agrees with the fact that both Smith and Reames testified that the HAWK was developed for law enforcement and employs a proprietary software structure. However James Reames testified that (R.T. 04/17/13 at 33 and 83-84, Respondents' ex KK) all the data in HAWK - case number, id number and most importantly the dates are easily programmable. Because all the data is programmable, James Reames testified that (Id at 33) "if you wanted to make it [an alteration] in the HAWK recording again you would then take your HAWK recorder and set it next to a couple of speakers that would reproduce the altered sound, and make a copy after you had set it up appropriately with a file name and the ID number and the other data that goes with it." In essence this explanation how to alter HAWK is identical to the information in Stutchman's affidavit.

As has already been stated above, although Smith initially did testify that "authentication questions can't really arise" (R.T. 03/14/13 at 80, Respondents' ex U), moments later he pointed to a wrong date in the HAWK header (Id. at 81-82) which casts doubt on the veracity of his initial statement and authenticity of the HAWK.

The attorney for the Respondents' second argument begins with a reference to

detectives' trial testimony that apparently there were other investigations where these detectives did not impound evidence prior to the end of shift. (Limited Answer, p25, bottom para.) This reference appears to imply that because the detectives testified that in the past they also did not impound evidence, that this conduct is not bad faith. It may indeed be that such testimony was truthful. It may be that these detectives have disregard for Phoenix PD rules, guidelines and procedure. It may also be that on occasion there is a valid reason and truthful and innocent explanation why evidence was not immediately impounded. But just because detectives acted similarly in the past, by not impounding evidence, that does not mean that in this investigation their explanation behind not impounding the evidence is truthful.

The attorney for the Respondents' argument brings us to the crux of this whole claim. The attorney for the Respondents, on page 26 of his Limited Answer, presents what he professes to be Phoenix PD Operations Order 8.1. What is presented below is a portion of page 1 from Order 8.1.

1. **RESPONSIBILITY FOR PROPERTY**

   A. Employees will be responsible for the disposition of any property coming into their possession during the course of their shift.

   B. <u>All</u> property will be impounded prior to the end of shift, with the following exceptions:

      (1) When authorized by a supervisor:

         (a) Employees will provide their supervisor with a verbal or written descriptive inventory of the property.

         (b) The property will be kept in a secure location until formally impounded.

         (c) The bureau commander must approve secure locations that are used solely for the purpose of temporary property storage.

         (d) Impounded items <u>will be</u> kept on Department property.

      (2) Impounding of cash, jewelry, items of value, drugs, and drug paraphernalia <u>will not</u> be delayed.

As a preliminary matter it needs to be pointed out that the portion of p1 of Order 8.1 that is presented above is not identical to the portion of p1 of Order 8.1 that is represented by Respondents in Limited Answer, p 26. Unlike p 26 of Limited Answer, the procedure presented

above does not have an emphasis on "coming into their possession" under the bullet point A. The emphasis on p26 of Limited Answer is an alteration by Respondents. Nevertheless the Respondents argue, based on what they portray to be Operations Order 8.1, that only property that physically comes into officers' possession is the one that needs to be impounded prior to the end of shift.

In instructing jurors about their fact-finding function, the courts normally advise them to consider all the evidence, not individual pieces standing alone. US v Minyard, 461 F 2d 931, 934 (9th Cir. 1972). A sum can be bigger than individual parts when relationship between different pieces provides additional information. The relevant portion of the Phx Police Manual is p1 of Operations Order 8.1 and is attached as ex 3 to Respondents' Ex FFF and III. It is reproduced on the next page in its entirety. The 30-page Order 8.1 is included as one of the documents in Resp. Ex A and B of Doc. 33.

There is no dispute between Respondents and the Petitioner that Order 8.1 subsection B, requires ALL property to be impounded prior to the end of shift, unless authorized by a supervisor. ALL is underlined in original to avoid ambiguity. This very information is clearly stated in both exhibits — in Limited Answer, p26 and in this Reply, p54. The only contention between the parties is whether or not "property" applies to recordings in this case. The Respondents contend that it does not apply to recordings because the recordings (in their view) did not come into possession of the officers. The full unabridged p1 of Order 8.1 defines 4 categories of property at the bottom of the page. These categories are Evidence, Found, Safekeeping and Prisoner's. P1 defines Evidence as "Any property that can be used to prove or disprove the commission of a crime." There is neither a doubt nor a dispute that recordings were used against the Petitioner to prove the alleged commission of a crime. Thus they fit squarely into the described above Evidence category of property. Since at trial none of the detectives claimed that the reason why they didn't impound the recordings is because they got permission from a supervisor, the recordings had to be impounded prior to the end of shift.

| EVIDENCE COLLECTION/IMPOUNDING PROCEDURES | | Operations Order 8.1 |
|---|---|---|
| **PHOENIX POLICE DEPARTMENT** | Rev. 04/08 | PAGE 1 |

1. **RESPONSIBILITY FOR PROPERTY**

   A. Employees will be responsible for the disposition of any property coming into their possession during the course of their shift.

   B. All property will be impounded prior to the end of shift, with the following exceptions:

      (1) When authorized by a supervisor:

         (a) Employees will provide their supervisor with a verbal or written descriptive inventory of the property.

         (b) The property will be kept in a secure location until formally impounded.

         (c) The bureau commander must approve secure locations that are used solely for the purpose of temporary property storage.

         (d) Impounded items will be kept on Department property.

      (2) Impounding of cash, jewelry, items of value, drugs, and drug paraphernalia will not be delayed.

   C. Found property where ownership can be established will be returned to the owner.

   D. Personal property where ownership is not disputed

      (1) Property will be processed and returned to the owner after being photographed.

      (2) Officers will document the release of property to the owner in the narrative section of the Departmental Report (DR).

      (3) A property invoice will not be created for property not impounded.

   E. Personal property where ownership is disputed

      (1) Officers may seize and impound property based on probable cause.

      (2) Property will be returned when ownership is determined through appropriate legal proceedings, consent of all parties, or proof of ownership.

   F. Prior to impounding any property, employees will carefully examine the invoice and all items to ensure the items are properly identified and processed.

2. **CATEGORIES OF PROPERTY** - There are four categories of property:

| | |
|---|---|
| Evidence (E) | Any property that can be used to prove or disprove the commission of a crime |
| Found (F) | Any property that comes into custody of the Department from any source not needed for the prosecution of a crime, contraband, or an unknown owner |
| Safekeeping (K) | Any property not defined as evidence that is to be temporarily held pending its return to the rightful (known) owner |
| Prisoner's (P) | Any personal property of an arrested person that cannot be released to another person or held by the jail at the time of arrest |

*Since detectives WARNER and EGEA provided testimony to the contrary, they therefore lied and acted in bad faith by not impounding critical evidence.*

54

The fact that Order 8.1 requires all evidence to be impounded prior to the end of shift is consistent with the under oath testimony of William Lee (Attached as Exhibit 5 to Respondents' Ex FFF and III), a retired Phoenix police officer, who provided evidence that recordings had to be impounded prior to the end of shift. It is also consistent with an affidavit filed by Frank Rodgers, who in his affidavit stated that det Egea lied when testifying that he would have to make a 40 mile round trip to impound the evidence. (Resp. Ex C of Doc 33. See also CV of F Rodgers, same exhibit.)

Arizona Rules of Crim. Procedure Rule 32.6(a) require prosecution in its response to attach "affidavits, records or other evidence... contradicting the petition[er]." Considering that prosecution has easy access to detectives within Phx PD and yet failed to buttress its argument, that recordings did not have to be impounded, with any affidavit, leads only to one conclusion— the evidence in support of prosecution argument does not exist.

The attorney for the Respondents' third and last argument is "that the authenticity of the recordings was corroborated by L.N.'s testimony". (Limited Answer, p27.)

Testimony of a witness is not an adequate substitute for tangible evidence that could have been preserved and presented at trial. United States v Elliott, 83 F. Supp. 2d 637, 644 (E.D. Virginia 1999). In the case before this Court, it is not an adequate substitute, because the recordings could have had audible and exculpatory responses to proposition to have the ex-wife and her family murdered.

Moreover Levi Najar had 175,000 reasons to provide false testimony. Pertaining to the $175,000.00 Jana Rozenman unequivocally testified that Levi Najar showed up at her door steps attempting to obtain the money.

R.T. 04/03/13 at 20-21, Respondents Ex GG:

Q  And do you remember that at that very moment when your mother was present, Levi decided to ask for money?

A  He had started talking about help. The next thing that he said, financial help.

Q  So he started talking about financial help. When you say like financial help, you don't mean financial aid that people get in college. You mean $175,000, correct?

A  That's what he said. He said I will need your help, financial help.


Id. at 28:

Q  Well, Levi Najar says I lost my identity. I need $175,000?

A  My understanding is that $175,000 was that he referred to me it was for his dad. That his dad was in debt.

Q  Well, what does his Dad have to do with any of it?

A  I don't know


Id. at 41:

Q  So when you said you were being pressured, that's not what you meant to say, right. When you said that, and I just want to ask you, when you said it over, and over again --

A  I -- told Levi that I don't like to be pressured...


Id. at 52-54:

By Mr Rozenman:

Q  Now -- and I just want to figure this out. At one point you say

that the $175,000, or the understanding of it, was that it was money for his debt [sic: dad]. On the previous page you say that it had something to do with Levi Najar's identity -- I'm sorry, not on the previous page. Two pages prior. It has something to do with Mr Najar's identity. Then you say it's a relocation expense. Well, which one is it?

*　　　　*　　　　*

A  I think the main part what he said it was for his dad, but what -- when he was trying, I think, to get somewhat justified, or whatever he was trying -- meaning by financial help, he was -- he said whatever, I have been through, or I am going through, trying to justify what he is about to ask me. That was my -- that's my understanding. I don't know.

Id at 59-60:

By Mr Rozenman

Q  When you told Levi Najar that the payments would be made over a period of time, what was your intent? Did you intent to pay?

A  There was never -- there was never an intention of paying.

*　　　　*　　　　*

Q  So you didn't intend -- what you said to Mr Najar, you were not truthful to Mr Najar?

A  I was not.

Levi Najar, however, repeatedly denied anything to do with $175,000.

R.T. 03/12/13 at 85-86, Respondents Ex 5:

Q  Do you remember Jana Rozenman telling you that $175,000 would be paid over a period of time in parts?

A I don't remember saying anything about or having Jana say to me about 175,000

R.T. 03/18/18 At 31-32, Respondents Ex V:

Q By Mr Rozenman: Mr Najar, are you aware that at some point on February 27, 2009, Jana Rozenman claims that you stopped by at her residence the day prior and you were pressuring her for $175,000, are you aware of that?

A Yeah, people were telling me that.

Q Tell us what you know about it.

A I don't know anything other than people have made that statement or made that claim before.

Id at 54:

Q By Mr Rozenman: Mr Najar, did you tell Jana Rozenman that you need $175,000 because your father had incurred a debt of $175,000?

A No.

R.T. 03/13/13 At 66, Respondents Ex W:

Q Mr Najar, is it possible you asked Jana Rozenman for $175,000?

A No.

Following the first trial judge Hoppman made a finding (see 11/22/10 minute entry, p 5, bottom para, Respondents' Ex O) that "[t]he credibility of the testimony of confidential informant Levi Najar was impacted by his asking alleged victim Jana Rozenman for money after defendant

had been arrested and by contradictions in his testimony at various stages of the investigation and during trial."

The second trial did not improve Levi Najar's credibility. It just provided him with another opportunity to make more contradictory statements. Levi Najar's blatant denials of trying to obtain $175,000 from Jana Rozenman reveal more than just the fact that he is not credible. His denials also support Petitioner's contention that Levi Najar conspired with Jana Rozenman to frame Petitioner. (For additional evidence of conspiracy between Jana and Levi please see Attachment B to the First Amended Petition, p7-8). Since there was no innocent explanation behind the $175,000, Levi Najar had no choice but to deny the fact that the conversation about $175,000 never took place.

In conclusion to the non-preservation of evidence argument Respondents write: "Thus, in addition to failing to prove non-preservation and "bad faith," Petitioner utterly fails to prove any potential for prejudice." (Limited Answer, p27) But this assertion goes contrary to the Respondents' earlier assertion (Id at 23) that "[w]here the nature of the evidence (exculpatory, inculpatory, or neutral) is unknown, there can be no showing of "prejudice in fact," and "thus, only a showing of bad faith implicates due process." Youngblood 173 Ariz. at 507."

Nevertheless, had recordings been properly preserved, on the recordings of surveillance, trial ex 96, 97, 109 and 110, the Petitioner's responses to proposition to have the ex-wife and her family murdered could have been audible and exculpatory. On trial ex 90, confrontation call, the statement for which Respondents relied as inference of guilt (Limited Answer, p3), when Petitioner supposedly asked Levi Najar "when are you going to be back at work?" could have been either entirely different or presented in a different context. And on trial ex 100, death notification, (R.T. 03/25/13 at 43-44, Respondents' Ex Y), that was used at trial as inference of guilt because Petitioner supposedly asked det Egea to stick around, that statement could have been either different or made under different circumstances than presented by det Egea.

In Brecht v Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) the US Supreme Court recognized that "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness." Thus the rudimentary demands of justice and fundamental fairness are precisely the values that the writ of habeas corpus is intended to protect. When the prosecution [10] knowingly presents perjured testimony, the court is not presented with a good faith attempt to honor constitutional rights, but instead with a bad faith effort to deprive the defendant of his right to due process and obtain conviction through deceit. If "bad faith by the police... must necessarily turn on the police's knowledge of the exculpatory value of evidence," Youngblood 488 U.S. at 56, then it means that not only detectives Warner and Egea provided false testimonies, but altered recordings from exculpatory to the present state. If suppression of evidence under Brady is a serious constitutional error, then its fabrication is a greater error, thus going over and above in satisfying the Brecht standard.

Under AEDPA, the Federal Court can grant habeas relief if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," 28 U.S.C. §2254(d)(1); or if the proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. §2254(d)(2). Despite the fact that the Rule 32 Court had before it Operations Order 8.1, an under oath deposition of William Lee, a notarized affidavit of Frank Rodgers and a notarized affidavit of Gregg Stutchman, the Court found that "[a]t no time has [defendant] been able to establish bad faith on the

---

Footnote 10: The "investigative officers are part of the prosecution [under] Butler" United States v Steel, 759 F.2d 706, 714 (9th Cir. 1985).

part of law enforcement or the failure to preserve evidence." See 03/28/16 minute entry, p.3, Respondents' Ex NNN. "To totally undermine the state fact-finding process, and render the resulting finding unreasonable, the over-looked or ignored evidence must be highly probative and central to petitioner's claim." Taylor v Maddox, 366 F.3d 992, 1001 (9th Cir. 2004). It is hard to imagine anything more central and probative than the evidence described above. This is especially so, since "the truth of each party's affidavits is assumed." Earp v Ornoski 431 F.3d 1158, 1170 (9th Cir. 2005)

Moreover, "[I]n making findings, a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings.[ ] [F]ailure to take into account and reconcile key parts of the record casts doubt on the process by which the finding was reached, and hence on the correctness of the finding." Taylor v Maddox at 1007-08. Here the Rule 32 Court failed to acknowledge the very evidence that would have established bad faith on the part of detectives Warner and Egea and reconcile its findings against such evidence. Thus the Rule 32 Court's determination of fact that Petitioner "[a]t no time... establish[ed] bad faith on the part of law enforcement or the failure to preserve evidence" is objectively unreasonable.

Any appellate court to whom the defect in the Rule 32 Court's fact-finding process is pointed out would be unreasonable in holding that such process and the resulting determinations were adequate and reasonable.

## Request for an Evidentiary Hearing.

In order to be entitled to an evidentiary hearing in federal court, petitioner who has failed to develop the factual basis of a claim in state court proceeding must (1) allege facts which, if proven, would entitle him to relief, and (2) show that he did not receive a full and fair hearing in a state court. Belmontes v Woodford, 335 F.3d 1024, 1053-54 (9th Cir. 2003).

Thus, Petitioner respectfully asks this Court to either take judicial notice of procedure in Order 8.1, that detectives were required to impound the recordings

prior to the end of shift or, alternatively, Petitioner asks this Court to grant an evidentiary hearing which Petitioner, despite numerous requests in state court, never received.[11] If such hearing is granted, Petitioner will present testimonies of expert witnesses that per Order 8.1 recordings had to be impounded prior to the end of shift.

Since trial record provides ample evidence that all recordings could have been easily tampered with (see p39-51 this Reply), prosecution, in its Response to Petition for Rule 32 (see p9 Respondents' Ex KKK), not only did not contest the veracity of Stutchman's affidavit (Resp Ex D of Doc 33), but moreover argued that the fact that all recordings were susceptible to alteration was established at trial. Neither did the Rule 32 Court, in its 09/28/16 minute entry (Respondents' Ex NNN), expressed any reservation that all recordings could have originally been different.

Respondents, however, in their Limited Answer (see p25, l 9-10), now assert that "authenticity questions can't really arise." Presuming, arguendo, that such position is not precluded by judicial estoppel (see e.g. Phelps v Alameida, 569 F.3d 1120, 1131 (9th Cir. 2009)), Petitioner respectfully asks this Court to present testimony of Gregg Stutchman to provide additional evidence, in support of his affidavit and the existing trial record, that all recordings could have been altered.

---

Footnote 11: In Pet. for Rule 32 Petitioner requested an evidentiary hearing on p1 of Respondents' Ex FFF and III and requested to present testimony of William Lee on p23 of Ex FFF and p24 of Ex III. Since Stutchman's affidavit was filed 4/16/16, after Pet. for Rule 32 was already filed, and since Frank Rodgers' affidavit was attached as a rebuttal in Reply to State's Response to Pet. for Rule 32, Petitioner in the same Reply (see Resp. Ex C of Doc 33, p 10, bottom para) requested an evidentiary hearing to "present testimonies of expert witnesses under all claims in Petition for Rule 32."

Rebuttal to Respondent's Assertion That the State Court's Rejection of Petitioner's Brady Claim Was Neither Contrary to, Nor an Unreasonable Application of Federal Law, Nor an Unreasonable Determination of the Facts.

The attorney for the Respondents brings forth three arguments pertaining to this claim. The first argument is that Order 8.1 does not apply to recordings. (Limited Answer, p28) But, the attorney for the Respondents argues, "even if the Court disagrees, Order 8.1 is an order of procedure in a police manual, which in no way impacts Petitioner's innocence or guilt." (Limited Answer, p28-29.)

The fact that Order 8.1 applies to evidence (defined as any property that can be used to prove or disprove the commission of a crime) and thus applies to recordings, has been addressed above and thus does not need to be rehashed again. It is not clear though what attorney for the Respondents means by stating that Order 8.1 "in no way impacts Petitioner's innocence or guilt." If by that he means that recordings were immaterial at trial, Petitioner strongly disagrees. During the trial (R.T. 04/25/13 at 147, Respondents' Ex PP) prosecutor described the audio and video of surveillance as his best evidence. At trial (R.T. 03/11/13 at 13, Respondents' Ex R) EX. 96, the HAWK recording of surveillance was admitted into evidence and played for the jury (Id. at 31) later the same day. Also, on the same day, the audio/video recording of surveillance, EX 97, was admitted into evidence (Id. at 33-34). During direct examination of Levi Najar the prosecution made extensive use of audio recordings. (Id. at 12-35.) Further at trial (R.T. 03/14/13 at 35, Respondents' Ex U) the prosecution's sound expert, Jeff Smith, testified that he assembled a video taken from across the street together with HAWK audio, creating ex 109. This recording was played for the

jury. Later the same day, Id at 56-64. The confrontation call, ex 90, was admitted into evidence (R.T. 03/11/13 at 96, Respondents' Ex R) and played for the jury the next day (R.T. 03/12/13 at 11, Respondents' Ex S). Prosecution made extensive use of that exhibit during direct examinations of Levi Najar (Id at 6-14) and det Warner (R.T. 03/26/13 at 106-112, Respondents' Ex Z and 04/01/13 at 95-103, Respondents' Ex BB).

Pertaining to the recording of death notification, ex 100, det Egea testified (R.T. 03/25/13 at 43-44, Respondents' Ex Y) that when he informed Petitioner of the alleged death, Petitioner, supposedly in response to that, asked det Egea to stick around and that such request to det Egea signified guilt. Capitalizing on the fact that now on ex 100 some questions and answers appear to be misaligned, prosecution in closing (R.T. 04/24/13 at 105-106, Respondents' Ex OO) heavily emphasized the relevance and importance of ex 100 to the state's case by arguing that during the death notification Petitioner was supposedly eva-sive. Moreover, in summation (Id at 91) prosecution emphasized the relevance and importance of inaudible responses on surveillance, ex 96, 97, 109 and 110, to the state's theory of the case. Thus the non-preserved recordings were highly important and material to prosecution in obtaining the conviction.

The Respondents' second argument is a variation of the first argument with additional supporting claims: (1) "there is no evidence that the State 'failed to preserve' the recordings by not formally impounding them"; (2) "[t]here is no likelihood that Order 8.1 would not have altered their [jury] decision in the slightest"; and (3) the information Petitioner sought "was a matter of public record." (Limited Answer, p 23.) Whether or not the (2) claim is a Freudian slip of the tongue (or rather a slip of the pen) that acknowledges a reasonable probability of a different outcome at trial, Petitioner proceeds to reply to it as if Respondents intended to state that there is no likelihood that Order 8.1 would have altered the jury's decision.

The (1) claim of this argument fails entirely. Not only Order 8.1 was pre-

sented to the Rule 32 Court, but in support of it Petitioner presented an under oath deposition of William Lee (attached as Ex 5 to Petition for Rule 32, Respondents' Ex FFF and III) and a notarized affidavit of Frank Rodgers (Reply to State's Response to Defendant's Petition for Rule 32, Resp. Ex C of Doc 33). Thus evidence that the State failed to preserve the recordings, in violation of Order 8.1, was squarely before the Rule 32 Court.

The second claim that Order 8.1 would not have altered the verdict is the "prejudice" component of Strickler v Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed. 2d 286 (1999). Since there isn't a single piece of evidence that cannot be not attributed to malfeasance of the officers, it is important to note that Respondents do not even attempt to make an argument that there was other evidence pointing towards Petitioner's guilt. Although Respondents rely solely on Order 8.1 as potentially impeaching evidence, Frank Rodgers' affidavit implicates det Egea in perjury outside of the requirement of Order 8.1. The Ninth Circuit examines withheld evidence individually and cumulatively. Barker v Fleming, 423 F.3d 1085, 1096 (9th Cir. 2005). Petitioner first addresses the prejudice component relying only on post-trial discovery of Order 8.1.

Even without Stutchman's affidavit (Resp. Ex D of Doc 33) there was sufficient evidence adduced at trial, through testimony of the defense sound expert, James Reames, that all of the recordings were susceptible to tampering (R.T. 04/16/13 at 98-99, 114-115, Respondents' Ex JJ and 04/17/13 at 21-29, 33, 83-84, 92-93, 96, Respondents' Ex KK). As has already been repeatedly stated, the Rule 32 Court, in it 09/28/16 minute entry (see p3, Respondents' Ex NNN), made finding that "the integrity of the evidence was a crucial issue" at trial. That means that discovery of Order 8.1, requiring all evidence to be impounded prior to the end of shift, would have easily undermined jurors confidence in reliability and trustworthiness of the recordings resulting in "a reasonable probability that, had the evidence been dis-

closed to the defense, the result of the proceeding would have been different."
United States v Bagley, 473 U.S. 667, 678 (1985).

Moreover, had Order 8.1 been disclosed, prior to trial, it would allow the Petitioner to make an inference that the recordings have undoubtedly been tampered with. With that inference in mind Petitioner would be more focused in seeking answers to how it could have been done and almost certainly would be able to present at trial additional evidence contained in Stutchman's affidavit (Respondents' Ex D of Docket 33).

"In evaluating th[e] question [of prejudice], it is necessary to consider all the relevant evidence that the jury would have had before it if [the defense] had pursued [a] different path [and was able to present all] the [other] evidence that almost certainly would have come with it." Wong v Belmontes, 558 U.S. 15, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009).

It is a component of analysis under Giles v Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) that discovery of Brady material can reasonably lead to other impeaching or exculpatory evidence. That is so because incomplete responses to discovery requests do more than deprive the defense of evidence; such responses also have "the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." Bagley at 682, 105 S.Ct. at 3384.

Besides the impeaching evidence contained in Order 8.1 the information contained in Stutchman affidavit would further tip the balance in favour of Petitioner.

The Brady material contained in Frank Rodgers affidavit is equally important. Jurors reliance on credibility of det Egea was highly important

at trial. This is so not only because jurors were able to rely on reliability of Ex 100, death notification, for what prosecution portrayed to be inference of guilt, but even moreso because det Egea testified that in a not recorded conversation (see p16-17 this doc.) Petitioner supposedly admitted hiring the hit men to murder his ex-wife and her family. (R.T.03/25/13 at 76, Respondents' Ex Y):

Q  Please tell the jury what you can recall about your interaction with Mr. Rozenman when you served him with that order of protection.

A  Well, when I contacted Mr Rozenman I obviously gave him the order of protection. He eventually asked me if his ex-wife and her family had been murdered.[12] At that time I informed him that they had not been murdered and that they were safe.

He also told me that he feared for his life. When I asked him why he feared for his life, he told me because of the individuals that were responsible or, I guess, the individuals that were hired to commit the act might, from what I took, were going to be coming looking for him.

Though det Egea's testimony was not flawless and a careful observant of det Egea's testimony might wonder why would Petitioner, being protected by the thick walls of jail, fear that someone from the free world will break in to harm him, in absence of any impeaching evidence it is likely the jurors credited this account.

Footnote 12: Based on det Egea's account it appears that Petitioner was under impression that an order of protection can be issued against people who had been murdered.

Had jurors known the Brady material in Frank Rodgers affidavit, i.e. that det Egea, having taken an oath to speak the truth, lied that he would have to endure a 40-mile trip to impound the evidence, they would be unable to rely on EX 100, death notification, for inference of guilt and furthermore would likely distrust his account of petitioner's admission of guilt. Since the integrity of recordings was a critical issue at trial, the mere fact that the jurors would have deemed the recording of death notification not reliable and det Egea's account of interaction with petitioner not trustworthy, "there is a reasonable probability... the result of the proceeding would have been different." Bagley, 473 U.S. at 682.[13]

The materiality standard of undisclosed Brady material was further solidified by prosecution's statement in summation: " the fact that Detective Warner had those disks for four months, not unusual. Not anything against police procedure. Dimiter would like you to believe that. It's just not true." (R.T. 04/25/13 at 153, Respondents' Ex PP.)

The third claim of this argument, as mentioned above, is that the information Petitioner sought "was a matter of public record." (Limited Answer, p.29.) Whether information is or isn't a matter of public record is not controlling. E.g. in United States v Aichele, 941 F.2d 761, 764 (9th Cir. 1991) the court concluded that there was no Brady violation because defense counsel

Footnote 13: There is no reason for Brecht's "substantial and injurious effect" analysis. As the Supreme Court explained in Kyles v Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), when considering a question about applying the Bagley disclosure requirement, the required finding of materiality necessarily compels the conclusion that Brecht standard is satisfied.

knew of a witness who was going to testify; knew that the witness had a criminal record; and knew that the record was with the California Dept. of Corrections. Under these circumstances, the court concluded, "a defendant has enough information to be able to ascertain the supposed Brady material on his own, there is no suppression by the government." Id. In Milke v Ryan, 711 F.3d 998, 1017 (9th Cir. 2013), on the other hand, the court found that even though the "documents showing [witness] misconduct were available in the public record [that] doesn't diminish the state's obligation to produce them under Brady." This is so, the court stated, because defense "was able to discover the court documents detailing Saldate's misconduct only after a team of approximately ten researchers in post-conviction proceedings spent nearly 7000 hours sifting through court records... The team worked eight hours a day for three and a half months, turning up 100 cases involving Saldate... A reasonably diligent lawyer couldn't possibly have found these records in time to use them at Milke's trial. Thus the documents... were suppressed." Id at 1018. The court in Milke explained that "[i]n determining whether evidence has been suppressed for purposes of Brady, our court has asked whether the defendant has enough information to be able to ascertain the supposed Brady material on his own." Id at 1017.

The Second Circuit came to the same conclusion about the suppression of public records. In United States v Payne, 63 F.3d 1200 (2d Cir. 1995), a witness testified that she had packaged drugs for the defendant. Id at 1205. But in her own criminal case, she submitted an affidavit saying she'd no involvement in the drug trade. Id. The defendant knew of the witness's criminal case and could have found the affidavit in the public record. Id at 1208-09. Still, the court rejected the claim that the prosecutor

had "no duty to disclose the affidavit... because it was in the public court records." Id at 1208. The test was whether defense counsel "was aware of facts that would have required him to discover the affidavit through his own diligent investigation." Id. At 1209.

Two of the United States Supreme Court cases are instructive.

In Strickler v Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed. 2d 286 (1999) and in Banks v Dretke, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), the defendants were found to have demonstrated cause for failing to present their Brady claims in state court because they had reasonably relied on the prosecutor's open file policy and assertions during state proceedings that everything known to the government had been disclosed. In both cases the United States Supreme Court held that petitioners reasonably relied on the state's representations that everything known to the government had been disclosed and that petitioners cannot be faulted for such reliance.[14]

The case of such reliance is before this Court. Prior to trial Petitioner filed motion for leave to Interview Witnesses And to Obtain Documentary Evidence. See Resp. Ex. E of Doc 33. On p10, question 16 sought: Please provide a copy of the City of Phx PD Policies And Procedure Manual for dealing with obtaining, transfering and retaining audio video evidence. Question 17 sought: Please provide a copy of the City of Phx PD Policies And Procedure Manual for preservation of the chain of custody for all evidence.

On 02/14/13 Petitioner interviewed Sgt William Long. (See attached Exhibit 6 to Respondents' Ex. FFF and III). During the inter-

Footnote 14: Strickler, 527 U.S., at 283-284, 119 S.Ct. 1936; Banks, 540 U.S. at 671, 124 S.Ct. 1256.

view Sgt Long provided the following information:

Q   Do you know what is the timeline within which, period of time the evidence has to be impounded?

    *    *    *

A   I don't know what time limit you would be referring to, sir.

Q   Well, the time limit that would be in the police rules, guidelines and procedures that require detectives to impound evidence within a certain period of time.

A   No, I don't know that off the top of my head.

Q   Do you know if such guideline does exist?

A   I don't.

Q   So you're not aware if there is any guideline within which there is a certain time limit within which the evidence has to be impounded?

A   Dimitri, I just answered that question.

Later the same day, on 02/14/13, Petitioner interviewed det Carmody. (See attached exhibit 7 to Respondents' Ex FFF and III.)

Q   Next question, please provide a copy of the City of Phoenix Police Department Policies and Procedures Manual dealing with obtaining, transferring and retaining audio video evidence. Can you tell us what is the protocol guideline?

A   The protocol for what I do — in this kind of situation there is no particular guideline because of it being an undercover operation.

Q   Well, but I understand it's an undercover operation. Do you have guidelines when it has to be transferred, what do you have to write, how do you have to go about it, who do you have to give it to?

Do you have anything -- do you have any of those guidelines?
A    No, sir.


Thus the only information Petitioner had was that rules for evidence impounding did not exist.

Following the trial, the prosecution, in its Response to Defendant's Various Motions for Discovery, filed 10/15/13, (Resp. p2 of Ex F of Doc 33) unequivocally asserted: "In this case defendant undertook multiple interviews in which he asked whether the police had any policies or guidelines regarding collection or preservation of evidence. These questions were asked prior to trial and were addressed prior to trial... Here, prior to trial the defense did request procedures from the police department relating to collection preservation of evidence, and was told that such guidelines did not exist."

Thus the Respondents' assertion that "Petitioner's Brady claim is ultimately meritless because the information he sought was a matter of public record" (Limited Answer, p29) is baffling. Yes, the information (Order 8.1) was a matter of public record and, as evidence clearly shows, Petitioner made every conceivable effort to obtain Order 8.1 from 2 public entities - the police dept. and the County Attorney's Office - and was repeatedly told that such evidence did not exist. Moreover, Respondents' continuation of the assertion above that "the information... was a matter of public record and thus, he could have (and did) obtained it himself" (Limited Answer, p29) belies the record. As Petitioner stated in his post-trial Supplement to Motion for New Trial (see p1-2 of Resp. Ex A of Doc. 33), it was a friend of his who, at last, discovered Phoenix Police Manual.

Contrary to Respondents' assertion, this particular Manual (see dated Table of Contents included, as one of the documents, in Resp. Ex C of Doc 33) not only was not discoverable prior to trial, but more importantly, it didn't even exist prior to trial. As the date in the top right corner of the Table of Contents indicates, this 72 Manual was last revised on 08/13 -

four months after the trial was over. Since the date in the top right corner of Order 8.1 indicates it to be last revised on 04/08, the procedure described in Order 8.1 existed and was applied to evidence during the time Petitioner's arrest and prosecution between 04/08 and 08/13. Moreover, as the U.S. Supreme Court authority in Strickler and Banks tells us, Petitioner is allowed to rely on representation of police and prosecution.

In determining whether evidence has been suppressed for purposes of Brady, the Ninth Circuit Court asks whether the defendant "has enough information to be able to ascertain the supposed Brady material on his own." United States v Aichele, 941 F.2d 761, 764 (9th Cir. 1991); United States v Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995). "Where a defendant doesn't have enough information to find the Brady material with reasonable diligence, the state's failure to produce the evidence is considered suppression." Milke at 1018.

Thus it is clear, from the representation of the detectives, the only information the Petitioner had was that rules for preservation of evidence did not exist.

The fact that Petitioner exercised due diligence, in attempt to find the rules, is not only supported by his interviews with Sgt Long and det Carmody, but has also been conceded by prosecution when prosecution, in its Response to Defendant's Various Motions for Discovery (see p2 Resp. Ex F of Doc 33) asserted that prior to trial Petitioner filed a motion and interviewed detectives only to be "told that such guidelines did not exist."

The Respondents' third and final argument is that "Petitioner has not substantiated his materiality claim with anything more than speculation" (Limited Answer, p29-30). For purposes of Brady in order for evidence to be deemed material there has to be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 at 678.

Material evidence can be either exculpatory or impeaching. Here it is both. Evidence is exculpatory if it's "favourable to accused" and "material either to guilt or to punishment". Brady, 373 U.S. at 87   73

Had jurors known that detectives violated rules and procedure for preservation of evidence and, while having taken an oath to speak the truth, lied about the rules, they would have made a reasonable inference that the reason why detectives violated Order 8.1 is because the recordings, had they been properly preserved, would have exculpated the defendant.

"Impeaching evidence" has been described as evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness," United States v Avellino, 136 F.3d 249, 255 (2d Cir. 1998), or as "evidence that is offered to discredit a witness...to reduce the effectiveness of [his] testimony by bringing forth evidence which explains why the jury should not put faith in [his] testimony." Friedman v Rehal, 618 F.3d 142, 153-54 (2d Cir. 2010).

Had jurors known that detectives lied why they did not impound the evidence they would distrust the detectives and distrust reliability of the recordings. Once recordings are deemed not reliable the jury would not be able to find the petitioner guilty, since the recordings were a centerpiece of the prosecution's case.

The attorney for the Respondents' assertion that Petitioner has not substantiated his materiality claim with anything, contradicts the record. The fact that recordings had to be impounded prior to the end of shift is supported by an under oath testimony of William Lee (see attached exhibit 5 to Respondents' Ex FFF and III) and by a notarized affidavit of Frank Rodgers (Resp. Ex C of Doc 33) Moreover, the fact that det Egea lied that he would have to make a 40 mile round trip, in order to impound the evidence, is also contradicted by Frank Rodgers' affidavit.

In the context of the Rule 32 Court's finding that "the integrity of the evidence was a crucial issue" at trial (03/28/16 minute entry, p3, Respondents' Ex NNN) any evidence that impeaches the detectives and undermines trustworthiness of the recordings, results in "a reasonable probability that...the results of the proceeding would have been different." Bagley, 473 U.S. at 678.

Similarly, considering the fact that recordings were crucial for the state's case, any exculpatory evidence, that leads jurors to believe that the reason why detectives

74

did not impound the evidence is because the recordings would have exonerated the Petitioner, also creates "a reasonable probability that... the results of the proceeding would have been different." Id.

The discovery of Order 8.1 also impeaches Levi Najar and thus also creates "a reasonable probability that... the results of the proceeding [pertaining to criminal damage] would have been different." Id. The Second Circuit decision in Gersten v. Senkowski, 426 F.3d 588, 614 (2d Cir. 2005) is uniquely similar to the facts of the case before this Court. In Gersten, a sexual offense case, a victim implicated Gersten in several counts of sexual assault. Some counts were supported by physical evidence, while others supported solely by victim's testimony. Following the trial, when it was learned that physical evidence was not reliable, the court vacated all counts observing that "[a] natural inference from the contrary medical expert testimony presented by petitioner on habeas, if it is credited, is that no penetration took place, and that the alleged victim was lying or mistaken in her testimony that she was penetrated. The latter inference infects all of the counts of which petitioner was convicted. The alleged victim's entire story is brought into doubt if it is demonstrated that no penetration took place. The trier of fact clearly relied on a finding of the alleged victim's credibility in reaching convictions for all of the counts, not only the ones involving penetration. The credibility finding clearly relied on the fact that the alleged victim's testimony was consistent with that of the prosecution's medical expert, and would be undermined if that testimony was rejected and the alleged victim was found to have lied or been mistaken with regard to penetration." Since detectives decided not to impound the recordings, it must mean that what Levi Najar told them — that Petitioner hired him to murder the family — did not pan out to be true. Had jurors known that Levi Najar's story did not pan out to be true, this fact would discredit Levi Najar's credibility not only in the conspiracy to commit murder count, but in the count of criminal damage as well. In closing, when asking the jury to find Petitioner guilty of criminal damage, prosecutor emphasized the fact that Levi Najar's credibility was consistent with

physical evidence presented in this case (R.T. 04/24/13 at 108-110, Respondents' Ex OO): "you can judge someone's credibility based on how their story stacks up against the facts... every piece of puzzle came together in this case. He [Petitioner] damaged the vehicle. That's criminal damage."

Furthermore, had jurors known that det Warner lied why he did not impound the recordings, they would further distrust his impartiality in assessing the credibility of Levi Najar. At trial (R.T. 04/02/13 at 87-89, Respondents' Ex CC) det Warner spoke at length how over several meetings with Levi Najar he found him to be "nothing but truthful." Id at 89. The fact that det Warner's credibility is now impugned further undermines confidence in the count of criminal damage. The jurors could have reasonably relied on det Warner's credibility assessment of Levi Najar. This is especially so since the evidence presented by prosecution in this count relied entirely on credibility of Levi Najar.

Therefore, based on two lines of reasoning above, the discovery of Order 8.1 undermines the jury's credibility assessment of Levi Najar and creates "a reasonable probability" that had the jurors known of Order 8.1 the result of the proceeding, in the criminal damage count, would have been different. Thus the discovery of Order 8.1 satisfies the Bagley materiality standard pertaining to the count of criminal damage as well.

"[w]here the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it." Taylor v Maddox, at 1001. Since all recordings could have been easily altered, it was a legal error, for the Rule 32 Court, to require Petitioner to prove tampering. Thus the Rule 32 Court's factual determination that, "experts who testified at the trial failed to find any indicia of the recordings having been tampered with" (09/28/16 minute entry, page 3, Respondents' Ex NNN) is not relevant and unreasonable under 3 elements of Strickler and no presumption of correctness can attach to it.

The decision is "contrary to" clearly established Federal Law when the state court identifies the right legal principle but applies it in an objectively unreasonable

way or if it unreasonably extended the law to a context where it should not apply. Alvarado v Hickman, 316 F.3d 841, 852 (9th Cir. 2002); Williams v Taylor, 529 U.S. 362, 404-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

It was objectively unreasonable for the Rule 32 Court to extend Brady beyond the three components in the holdings of Strickler, 527 U.S. at 281-82 — (1) evidence must be favourable; (2) evidence was suppressed; (3) defendant was prejudiced, i.e. a reasonable probability of a different outcome at trial — to require Petitioner to prove tampering.

Any appellate court to whom the defect in the state-court's application of this Federal Law is pointed out, would be unreasonable in holding that the application of such law was reasonable.

### Request for an Evidentiary Hearing.

Petitioner respectfully asks this Court to hold an evidentiary hearing on the same grounds as on p 61-62 of this document.

### Rebuttal to the Assertion That the State Court's Rejection of Petitioner's Prosecutorial Misconduct Claim Was Neither Contrary to, Nor an Unreasonable Application of Federal law, Nor an Unreasonable Determination of the Facts.

Respondents assert that Petitioner's argument is based on a proposition that at trial, when det Warner testified that evidence does not need to be impounded, that prosecutor must had known that that portion of det Warner's testimony was not true (Limited Answer, p 30-32). This is not Petitioner's argument. Petitioner's argument is that when at trial det Warner testified that prosecutors also don't need to impound evidence (R.T. 03/26/13 at 156, Respondents' Ex Z), the prosecutor must had known that this part of det Warner's testimony was not true (see Attachment B to the First Amended Petition, p 70-71).

Petitioner next addresses any of the Respondents' arguments that might apply to the claim Petitioner made.

The attorney for the Respondents argues that mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony. Petitioner's argument, however, is not based on inconsistent testimonies of det Warner pertaining to whether or not prosecutors are exempt from impounding evidence. In fact Petitioner cites only one testimony by det Warner on this subject. Petitioner's argument is based on the presupposition that there must exist rules for preservation of evidence that apply to prosecutors and therefore, det Warner's testimony to the contrary, resulted in the use of false testimony by prosecution. In his pleading Petitioner asserts why rules for preservation of evidence that apply to prosecutors must exist and how the testimony to the contrary was material. Id.

Next, the attorney for the Respondents argues that Petitioner cannot demonstrate that det Warner's testimony was actually false (Limited Answer, p 31.) As petitioner asserted in his pleading (Attachment B, p 70) "[I]n order to establish that (1) this testimony was false and that (2) the prosecution knew or should have known about it, petitioner respectfully asks this Court, under Rules 6 and 7 governing section 2254, to order prosecution to provide Procedures of the Office... [and] to allow [Petitioner] to interview the Maricopa County Attorney on office policies for preservation of evidence." Id.

Lastly, the attorney for the Respondents asserts that "this Court is limited to the state-court record in determining whether the state courts unreasonably applied federal law in this case where the state courts rejected [this] claim for lack of merit." (Limited Answer, p 32, Footnote 7.)

"Where a state court's decision is unaccompanied by an explanation [such as in this case], the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v Richter, supra.

The Rule 32 Court's summary dismissal of this discovery request must imply

that even if rules for preservation of evidence for prosecutors exist there is
(1) either no nexus between det Warner providing false testimony that pro-
secutors are exempt from impounding evidence and that such testimony makes
his own claim, that detectives are also exempt from impounding evidence,
more credible; (2) or assuming that there is a nexus and such nexus did make
det Warner's testimony more credible (i.e. that he did not have to impound evi-
dence), that whether or not det. Warner misled the jury, on the subject of evi-
dence impounding, was immaterial to the jury's verdict.

The fact that det Warner's testimony, that prosecutors are exempt from
impounding evidence, bolstered his own testimony was supported by Nobel
Prize winner Daniel Kahneman finding (see Thinking Fast and Slow, p62) that
truthfulness of one segment of a person's statement suffices to make the
whole statement to feel familiar, and therefore true. In other words if the
jury accepted as truth det Warner's statement that prosecutors are exempt
from impounding evidence,[15] the jury then was more likely to accept as truth
det Warner's entire assertion. R.T. 03/26/13 at 156, Respondents' Ex Z:

Q    All right. Now, let's talk about that a little bit. When we're talking
about chain of custody, there are some people who are allowed to have
evidence during the course of an investigation, aren't there?

A    Yes, there are.

Q    And who are those people?

A    The case agent, myself, any other detective involved in the case, and
the County Attorney.

This is a perfect example where bundling a statement with a portion

Footnote 15: Considering that such statement went uncontradicted in presence
of a prosecutor provided the jury with additional assurance that it is true.

79

that is perceived by a listener to be true, makes the entire statement appear to be true. Kahneman calls it an illusion of truth. (See Thinking Fast and Slow, p.61-62)

Psychologist Professor Stuart Sutherland, in his book Irrationality (see p.180-182), provides a simple explanation behind this phenomenon, and calls it 'representativeness' error (although in psychology it is typically called conjunction fallacy):

"Subjects were given brief description of individual people: for example, they might be told, 'Linda is thirty-one years old, single, outspoken and very bright. She majored in philosophy. As a student, she was deeply concerned with issues of discrimination and social justice, and also participated in anti-nuclear demonstrations.' They were then asked to rank the following statements about Linda in terms of how likely each was to be true.

a. Linda is a teacher in an elementary school.

b. Linda works in a bookstore and takes yoga classes.

c. Linda is active in the feminist movement.

d. Linda is a psychiatric social worker.

e. Linda is a member of the League of Women Voters.

f. Linda is a bank teller.

g. Linda is an insurance salesperson.

h. Linda is a bank teller and is active in the feminist movement.

Needless to say, the subjects thought it much more likely that Linda was a feminist (statement c) than that she was a bank teller (statement f). But when asked to judge how likely it was that Linda was a feminist bank teller (statement h), they thought it much more likely than that she was simply a bank teller. This judgment cannot possibly be correct: obviously there must be more women bank tellers than bank tellers who are feminists for the simple reason that some bank tellers are not feminists. The mistake occurs

because Linda's description is typical (REPRESENTATIVE) of a feminist so it fits half of the two categories whose combined likelihood the subjects are asked to judge. Irrationally the fact that she is probably a feminist increases in the subjects' eyes the probability that she belongs to both categories (feminist and bank teller). To put it more technically, the subjects seem to have averaged the two probabilities instead of multiplying them: if the probability of Linda being a feminist is 0.7 and that of her being a bank teller is 0.1, then the probability of her being a feminist bank teller is 0.07 not 0.4...

This sort of error can produce the following effect. When someone is told something very implausible [such as that evidence must not be impounded], he is more likely to believe it if at the same time he is told something highly plausible [such as in the presence of the County Attorney that County Attorneys are exempt from impounding evidence. Surely the jurors must have thought that if that was not true the County Attorney, who bares credibility of the government, would surely have corrected Det Warner and not allow false testimony into the record]. But something implausible — which is to say improbable — cannot become more probable just because some highly probable material is associated with it. Indeed the probability that all the material is true is reduced by adding extra material however plausible. This situation is exactly analogous to the experiment just described: the presence of the plausible material is likely to increase belief in the implausible statement. This trick is used by all accomplished liars as well as by many lawyers. It should be added that a further mechanism is at work.

If we hear various plausible statements from someone, it may increase our belief in his veracity and so we come to believe his less plausible statements."

Det Warner's testimony, that he does not have to impound evidence, was

a highly relevant issue for prosecution's case. First, in summation the prosecution emphasized the relevance and importance of the supposed fact that evidence does not need to be impounded (R.T. 04/25/13 at 153, Respondents' Ex PP): "So, the fact that Detective Warner had those disks for four months, not unusual. Not anything against police procedure. Dimitri would like you to believe that. It's just not true." Second, the Rule 32 Court made a finding that "the integrity of the evidence was a crucial issue" at trial (05/28/16 minute entry, p3, Respondents' Ex NNN.) Therefore any evidence that impeaches credibility of det Warner, who was in possession of recordings untill some of them were eventually impounded, is critical as well.

Under such circumstances any appellate court to whom the defect in state court's fact-finding process is pointed out would be unreasonable in holding that the discovery Petitioner requested was immaterial.

Conclusion.

Petitioner respectfully asks this Court to either take judicial notice, that Operations Order 8.1 required detectives to impound recordings prior to the end of shift, or hold an evidentiary hearing so that Petitioner can present expert witness testimony, that by not impounding recordings prior to the end of shift detectives violated Order 8.1. Petitioner requested such hearing in Rule 32 Court, but never received (see p 62 of this doc., footnote 11).

The AZ Court of Appeals has previously concluded that "procedures contained in the [Phoenix] Police Operations Orders... [have] content [that] is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." State v Rogers, 216 Ariz. 555, 560 (App.Div1, 2007). This finding satisfies prerequisite for taking judicial notice under Fed. R. Evid. 201(b)(2).

Judicial notice can be taken at any stage of the proceedings. Fed. R. Evid.

201(d). A court shall take judicial notice if requested by a party and supplied with the necessary information. Fed. R. Evid 201(c)(2) Police procedure is an appropriate document to be taken as judicial notice, State v Rojers, 555, 560 (App. Div. 1, 2007) (taking judicial notice of the Phoenix Police Dept. Operations Order 4.11); Driebel v City of Milwaukee, 298 F.3d 622, 631 (7th Cir. 2002) (taking judicial notice of certain sections of the Milwaukee Police Dept. Manual); Leisure v City of Cincinnati, U.S. Dist. Ct. S.D. Ohio Western Div. May 6, 2003  267 F. Supp. 2d 848  2003 WL 21436107 (taking judicial notice of the City's Police Manual); Wiggins v Metropolitan Government of Nashville-Davidson County, U.S. Dist. Ct., M.D. Tennessee, Nashville Div. Nov 14, 2017 Slip Copy 2017 WL 5444741 (taking judicial notice of the city's police procedure manual).

If this Court grants an evidentiary hearing, so that Petitioner can present expert witness testimony, that detectives were required to impound recordings prior to the end of shift, such testimony will (1) definitively establish the Brady Violation[16] and Non-Preservation of Evidence claims, and since

---

Footnote 16: In House v Bell, 547 U.S. 518, 519, 126 S. Ct. 2064, 2067 (2006) the U.S. Supreme Ct. noted in holdings that "[t]he evidentiary disarray surrounding the...evidence... would prevent reasonable jurors from placing significant reliance on the...evidence."

Moreover "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have effected the judgment of the jury." U.S. v Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976); U.S. v Young, 17 F.3d 1201, 1203 (9th Cir. 1994). Since in the instant case there is more than a reasonable likelihood that jurors relied on false testimonies of the detectives, when assessing reliability and trustworthiness of the recordings, and in turn used the same recordings as confirmation of reliability of Levi Najar, the false testimonies of the detectives are what in essence satisfies Brecht standard of "substantial and injurious effect" on outcome at trial, in both counts.

(2) Petitioner requested such hearing in state court, but never received, the requirements set forth for such hearing in Belmontes v Woodford, 335 F.3d 1024, 1053-54 (9th Cir. 2003) and in Williams v Taylor, 529 U.S. 420, 429-37, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) are satisfied.

While the Supreme Court precedent is the only authority that is controlling under AEDPA, Federal Courts look to the Ninth Circuit case law as persuasive authority for purposes of determining whether a particular state court decision is an "unreasonable application" of the Supreme Court law. Davis v Woodford, 384 F.3d 628, 638 (9th Cir. 2004). When undisclosed Brady material undermines critical or crucial trial evidence conviction must be overturned. Benn v Lambert, 283 F.3d 1040 (9th Cir. 2002); Milke v Ryan, 711 F.3d at 1009; Bagley v Lumpkin, 798 F.2d 1297, 1301 (9th Cir. 1986); United States v Shaffer, 789 F.2d 682, 688-89 (9th Cir. 1986); Hayes v Brown, 399 F.3d 972, 986 (9th Cir. 2005).

Had it been true that detectives are allowed not to impound original downloads from the recording devices and then share the downloads, that are expected to be used as evidence at trial, with a "myriad of people," such policy would indeed be a bad faith policy because it would needlessly deprive defendants from being able to establish a defense. More specifically, such policy would deprive this Petitioner from being able to affirmatively establish the precise responses on surveillance to proposition to have the ex-wife and her family murdered.

In Attachment B to the First Amended Petition the Non-Preservation of Evidence in Bad Faith claim is twofold. The first part (p 8-15) relied on evidence of the detectives not impounding recordings and subsequently lying why they were not impounded. The second part (p 15-21)[17] (see footnote 17 on the next page) stemmed from holdings in Arizona v Youngblood,

488 U.S. at 51, where the U.S Supreme Court stated that "the police's failure to refrigerate the victim's clothing and to perform tests... can at worst be described as negligent. None of this information was concealed from respondent at trial." In Attachment B (see p15) Petitioner argued that this holding is a clear recognition that concealment is one method to prove bad faith. In the second part Petitioner presented extensive evidence of detectives concealing facts and information, It is important to note that Respondents did not even make an effort to rebut the evidence of concealment presented by Petitioner.

When the prosecution presents perjured testimony and evidence that had been procured by not preserving the recordings, the Court is not presented with a good faith attempt to safeguard constitutional rights, but instead with a bad faith effort to deprive the defendant of his right to due process and obtain conviction through deceit. Defendant is entitled to a fair trial under fundamentally fair procedure. Cheating the process undoubtedly violates Constitution.

State court judges may have difficulty resisting popular pressures. Accordingly, their decisions may satisfy popular interests and yet convey one set of meanings while covertly expressing quite another. The net result is an objectively unreasonable application of the facts of the case to a particular United States Supreme Court precedent. This Court is immune to such pressures and is vested by congress to grant habeas relief when there is a violation of the Constitution or law of the United States.

In Brecht itself the Supreme Court recognized that "the writ of

Footnote 17: See Second Notice of Errata, filed 10/22/18, for correction to page 19 of Attachment B to the First Amended Petition.

85

habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness." Brecht 507 U.S. at 633. Thus it is difficult to see how concerns of finality could trump rudimentary demands of justice and fundamental fairness when those are precisely the values the writ of habeas corpus is intended to protect.

Although in its Response to Defendant's Petition for Rule 32, prosecution did not contest the fact that all recordings could have been altered, Petitioner respectfully asks this Court to present testimony of Gregg Stutchman to provide an under oath evidence in support of his affidavit. As stated above, the Stutchman affidavit was filed on May 26, 2016, after the Petition for Rule 32 had already been filed. However, it was filed in time for prosecution to address it in its Response, which they did (Respondents' Ex KKK, p 9). In Reply to State's Response to Defendant's Petition for Rule 32 (Resp. Ex C of Doc 33, p 10, bottom para) Petitioner requested to "present testimony of expert witnesses under all claims in Petition for Rule 32." Although trial record provides ample evidence that all recordings could have been tampered with, the Stutchman affidavit will further advance this fact.

Petitioner respectfully asks this Court to find Ground 5 cognizable and Grounds 3, 4 and 5 exhausted.

Unlike cases in which prosecutor fails to disclose Brady material, where a court may order a new trial at which the undisclosed evidence can be introduced, the non-preservation of evidence that is central to the case may permanently deprive defendant of due process. There is no question that Petitioner's responses on surveillance, to proposition to murder the ex-wife and her family, could have been audible and

exculpatory and as such would have exonerated the Petitioner. Accordingly, Petitioner respectfully asks this Court, upon finding of bad faith by the detectives, to dismiss the indictment and bar reprosecution on conspiracy to commit murder count. Since the Brady violation affects the count of criminal damage, Petitioner respectfully asks this Court to remand this count to trial court for new trial. Alternatively, Petitioner respectfully asks this Court to remand both counts to trial court for new trial.


Signed by: DRoz~
         Dimitri Rozenman

## Certificate

Original and two copies mailed to Clerk of Court on June 6, 2019.

A copy of the foregoing mailed to:

William S. Simon

Assistant Attorney General

Criminal Appeals Section

2005 N. Central Ave

Phx, AZ 85004-1580.


Signed by: Droz

Dimitri Rozenman.